CLOUGHERTY PACKING COMPANY, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1954–82.    Filed May 20, 1985.

*Brian J. Seery,* for the petitioner.
*Marshall W. Taylor,* for the respondent.

---

[19]See note 6 *supra.*

OPINION

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable years ended July 29, 1978, and July 28, 1979, in the amounts of $370,944 and $628,202, respectively. The sole issue for decision is whether petitioner is entitled to deduct, as an ordinary and necessary business expense, the entire amount paid to an unrelated insurance carrier as insurance premiums for workers' compensation coverage where the unrelated carrier reinsures 92 percent of such risk with the wholly owned captive insurance company of petitioner's wholly owned subsidiary and cedes 92 percent of the premiums to the captive.

All of the facts were stipulated. The stipulation of facts and exhibits are incorporated by this reference. Petitioner Clougherty Packing Co. was incorporated under the laws of California on December 31, 1945. At the time of filing the petition, its principal place of business was Los Angeles, California. It filed its corporate Federal income tax returns for the taxable years ended July 29, 1978, and July 28, 1979, with the Internal Revenue Service Center in Fresno, California. The returns were not consolidated returns with its subsidiaries.

During the taxable years involved, petitioner owned all of the issued and outstanding stock of Clougherty Packing Co. of Arizona which was incorporated under the laws of Arizona on July 26, 1977. Petitioner's Arizona subsidiary, in turn, owned all of the issued and outstanding stock of Lombardy Insurance Corp. (Lombardy). Lombardy was incorporated under the laws of Colorado on November 24, 1976, pursuant to the Colorado Captive Insurance Company Act. During the taxable years involved, Lombardy was a corporation in good standing with the Department of Insurance of the State of Colorado.

Before 1970 and continuing through the taxable years involved, petitioner employed more than 1,000 workers in California which required that petitioner obtain coverage under the California workers' compensation laws. It was engaged in slaughtering and meat processing, and numerous workers' compensation claims were filed against petitioner by its employees. The employees claimed that they contracted brucellosis, an industrial disease connected with meat processing. Section 3700 of the California Labor Code required employers to maintain workers' compensation coverage by one

or more insurers authorized to write compensation insurance in California, or to secure from the California Director of Industrial Relations a certificate of consent to self-insure. Prior to 1978, petitioner elected, in part, to be self-insured with respect to workers' compensation coverage and it, therefore, secured a certificate of consent from the California Director of Industrial Relations. Liability in excess of the limited self-insurance was covered by insurance policies with insurers qualified to do business in California. The per claim limits of petitioner's self-insurance and the California insurance carriers who carried the excess over petitioner's self-insurance coverage from July 31, 1971, through July 30, 1977, were as follows:

| Year | Self-insurance | Coverage by carrier in excess of self-insurance |
|---|---|---|
| July 31, 1971 | $35,000 | Employers Surplus Lines, Inc.— all in excess of $35,000 |
| July 29, 1972 | ¹50,000 | Reserve Insurance—excess of $35,000 up to $50,000² |
|  | 50,000 | Employers Reinsurance—all in excess of $50,000 |
| July 27, 173– Aug. 2, 1975 | 35,000 | Fremont Indemnity Co.— all in excess of $35,000 |
| July 31, 1976 | 75,000 | American Bankers Ins. Co. of Florida—all in excess of $75,000 |
| July 30, 1977 | 100,000 | Puritan Insurance Co.— all in excess of $100,000 |

In order to obtain State certification for self-insurance, petitioner was required to deliver securities to the California State Treasurer as security for potential workers' compensation liabilities. The costs of such securities deposited with the California State Treasurer during the fiscal years ended July 31, 1971, through July 30, 1977, were as follows:

| FYE— | Amount |
|---|---|
| July 31, 1971 | $638,269 |
| July 29, 1972 | 638,269 |
| July 27, 1973 | 638,269 |
| Aug. 3, 1974 | 638,269 |
| Aug. 2, 1975 | 857,110 |

¹and² The parties stipulated this schedule and did not explain this discrepancy.

| FYE— | Amount |
|---|---|
| July 31, 1976 | $857,110 |
| July 30, 1977 | 857,110 |

Earnings from the securities inured to the benefit of petitioner while on deposit with the State.

From January 1974 to October 1976, petitioner maintained its own staff of adjusters to handle claims for workers' compensation. After October 1976, such claims were handled by an independent insurance broker, Frank B. Hall Management Co. (Hall), a nationwide brokerage firm. During 1976, Hall prepared and submitted to petitioner a detailed report entitled "Captive Insurance Study for Clougherty Packing Co." The report proposed that petitioner insure its liabilities for workers' compensation directly with its own captive insurance company organized under the laws of Colorado. This proposal was not adopted on advice of petitioner's counsel because of legal and regulatory problems under California law. Rather than establish a direct insurance captive, the management of petitioner decided to establish a Colorado captive to reinsure some of petitioner's risk. The management concluded that a captive insurance arrangement would reduce the cost of its liabilities for workers' compensation coverage by: (1) Increasing investment income above the amount received on the securities deposited with the State Treasurer of California; (2) eliminating the underwriting costs paid to outside insurance carriers; and (3) receiving favorable Federal tax treatment for the captive insurance company subsidiary which treatment is available to all insurance companies.

The articles of incorporation for Lombardy were filed in Colorado on November 24, 1976, but business operations did not commence until a later date. Lombardy was capitalized for $1 million, as required by the Colorado Commissioner of Insurance. Colorado statutes required a minimum capitalization of $750,000. On July 27, 1977, the $1 million of capital was fully paid in, from which $750,000 was used to purchase a certificate of deposit in a Colorado bank, jointly held by Lombardy and the Colorado Division of Insurance. During September 1977, Hall proposed to petitioner's management that Lombardy join a reinsurance underwriting group. As of September 1977, Lombardy was not yet operating and the

management of petitioner rejected the group reinsurance underwriting proposal.

Petitioner and Fremont Indemnity Co. (an unrelated insurer licensed to write workers' compensation insurance in California, hereinafter referred to as Fremont) negotiated for a captive insurance program for petitioner.

On October 25, 1977, Fremont offered, in writing, to provide a captive reinsurance program for petitioner, the pertinent terms of which were as follows:

1. The cost to be 5 percent of the annual earned premium, plus premium taxes, bureau fees, and nonincidental costs.

2. The "Clougherty Captive Company" (as Fremont identified it in its offer) would assume the first $100,000 of any risk, with coverage in excess of $100,000 for any risk being furnished by Fremont.

3. All funds were to be remitted to "Clougherty's captive" monthly, based on remittances by petitioner to Fremont, less costs and deficiencies in collateral.

On October 31, 1977, petitioner's attorney accepted Fremont's offer on behalf of petitioner with some "clarifications" agreed to by telephone on October 28, 1977. The name, Lombardy, was substituted for Clougherty captive. Lombardy would reinsure the first $100,000 of any risk insured with Fremont. In essence, Fremont would be assuming the risk up to $100,000 but would reinsure that risk with Lombardy. "The turn around time on money, both from Fremont to Lombardy and from Lombardy to Fremont, will be no more than five days."

During December 1977, Hall requested the Colorado Insurance Division to perform an organizational examination of Lombardy which was accomplished and, on December 30, 1977, the Colorado Division of Insurance issued to Lombardy a certificate of authority to conduct business as a captive insurance company in the State of Colorado.

The officers and directors of Lombardy have also been officers or employees of petitioner or Hall since the organization of Lombardy and throughout the taxable years involved. During the same taxable periods, Lombardy's sole business was the reinsurance of petitioner's workers' compensation coverage. Lombardy has never owned or leased any real property and the address of its principal office during the

taxable years involved was the address of Hall. Lombardy had no employees but, instead, conducted its day-to-day business through employees of Hall pursuant to a management agreement between Lombardy and Hall.

During April 1978, petitioner insured its workers' compensation coverage for 1 year with Fremont, effective January 1, 1978. Fremont notified the State of California that it had issued a valid workers' compensation insurance policy in a form approved by the California Insurance Commissioner to petitioner for 1978 and 1979. The State of California Workers' Compensation Insurance Rating Bureau set the premium rate for the years in question. Lombardy agreed to reinsure the first $100,000 per occurrence for all of petitioner's risks insured by Fremont. In addition, Fremont agreed to cede (transfer) to Lombardy 92 percent of the premiums it received from petitioner. The reinsurance agreement was effective January 1, 1978, but was executed by Lombardy on February 3, 1978, and by Fremont on March 22, 1978. The Colorado Insurance Commissioner approved the premium rates and reinsurance cessions for the years involved. Under the reinsurance agreement, Lombardy was required to and did secure a $200,000 irrevocable letter of credit to be held by Fremont as security for unpaid open losses and unearned premiums. In addition, Lombardy agreed to deposit securities with the California State Treasurer to cover demands for statutory reserves made upon Fremont by the California Department of Insurance.

There was no agreement or understanding between petitioner, its wholly owned subsidiary in Arizona, Hall, or Fremont that petitioner would indemnify Fremont, that it would pay additional capital into Lombardy, or that it would take any steps, direct or indirect, to assure that Lombardy would perform its obligations under its reinsurance agreement with Fremont. The premium paid by petitioner to Fremont was set by the Workers' Compensation Insurance Rating Bureau of the State of California; the rates for reinsurance cessions from Fremont to Lombardy were negotiated between Fremont and Lombardy, but had to be approved by the Insurance Commissioner for the State of Colorado.

Following the effective date of the insurance and reinsurance arrangement, January 1, 1978, petitioner was no longer

required to deposit securities with the State Treasurer of California to cover workers' compensation claims arising after January 1, 1978. Subsequent to being informed that petitioner was no longer self-insured, the State of California audited the self-insurance reserves of petitioner and demanded an increase in the amount of securities on deposit for pre-1978 claims. Later, the reserves on deposit with the State of California were reduced as petitioner's pre-1978 liabilities were settled and paid. The values of the securities on deposit for the taxable years ended July 29, 1978, and July 28, 1979, were $1,489,644 and $1,120,303, respectively.

During the taxable years ended July 29, 1978, and July 28, 1979, petitioner accrued and deducted as premiums for workers' compensation insurance $840,000 and $1,457,500, respectively. During the taxable years ended July 29, 1978, and July 28, 1979, Fremont paid to Lombardy $772,900 and $1,340,000,[3] respectively, as reinsurance premiums.

The Commissioner, in the statutory notice of deficiency, disallowed that portion of petitioner's deductions for premiums on workers' compensation insurance which represented the "reinsurance premiums" paid by Fremont to Lombardy in the amounts of $772,800 and $1,340,900 for the taxable years ended July 29, 1978, and July 28, 1979, respectively.

The first captive insurance company case submitted to this Court was *Carnation Co. v. Commissioner*, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981). An appeal in the instant case would also be to the Court of Appeals for the Ninth Circuit. *Carnation Co. v. Commissioner, supra*, was submitted to the Court upon cross motions for summary judgment and the instant case was submitted fully stipulated.

Carnation and an unrelated insurance company, American Home Assurance Co. (American Home) entered into an insurance agreement, and American Home simultaneously reinsured 90 percent of Carnation's risk with Carnation's wholly owned Bermuda subsidiary, Three Flowers Assurance Co. (Three Flowers). We held that Carnation was not entitled to deduct as insurance premiums 90 percent of its payments to American Home. We based our holding upon *Helvering v. Le Gierse*, 312 U.S. 531 (1941).

---

[3]There is a small discrepancy between the amounts stipulated by the parties and the amounts shown in the statutory notice. The discrepancy has no effect on the outcome.

*Le Gierse* involved the exclusion from the gross estate of a portion of the insurance proceeds payable to decedent's daughter. Shortly before her death, the decedent purchased from an unrelated insurance company a single premium life insurance policy, naming her daughter as beneficiary. The decedent simultaneously purchased a single premium lifetime annuity payable to herself from the same unrelated insurance company. The insurance company agreed to issue the life insurance policy only upon the condition that petitioner simultaneously purchase the annuity. The Court held that the life insurance and annuity transaction were not separate and distinct transactions and should be considered together. It reasoned that "annuity and insurance are opposites; in this combination the one neutralizes the risk customarily inherent in the other. From the company's viewpoint, insurance looks to longevity, annuity to transiency." 312 U.S. at 541. The Court went on to hold that the combination of agreements did not represent a shifting of the risk of loss inherent in insurance; therefore, the proceeds received by the daughter did not represent an amount receivable as insurance.

We applied *Le Gierse* to the facts in *Carnation* as follows:

By entering into the agreements in issue, Carnation attempted to shift its risk of property loss due to fire, lightning, vandalism, malicious mischief, sprinkler leakage, flood, and earthquake shock. The agreements attempted ultimately to shift 90 percent of the risk to Three Flowers and 10 percent of the risk to American Home. In the event of a covered casualty, the loss suffered by Carnation ultimately would be borne 90 percent by Three Flowers and 10 percent by American Home. The agreement to purchase additional shares of Three Flowers by Carnation bound Carnation to an investment risk that was directly tied to the loss payment fortunes of Three Flowers, which in turn were wholly contingent upon the amount of property loss suffered by Carnation. The agreement by Three Flowers to "reinsure" Carnation's risks and the agreement by Carnation to capitalize Three Flowers up to $3 million on demand counteracted each other. Taken together, these two agreements are void of insurance risk. As was stated by the Court in *Le Gierse*, "in this combination the one neutralizes the risk customarily inherent in the other." 312 U.S. at 541. [71 T.C. at 409.]

Two U.S. District courts have followed the rationale of *Carnation* to reach the same result, *Stearns-Roger Corp., Inc. v. United States*, 577 F. Supp. 833 (D. Colo. 1984), and *Beech Aircraft Corp. v. United States*, an unreported case (D. Kan. 1984, 54 AFTR 2d 84–6173, 84–2 USTC par. 9803). One U.S.

District Court applied the rationale of *Carnation*, but reached a contrary result on factual distinctions. *Crawford Fitting Co. v. United States*, 606 Fed. Supp. 136 (N.D. Ohio 1985).

Respondent, in the instant case, urges us to adopt a concept referred to as "economic family." It is apparent from the opinions in *Stearns-Roger* and *Beech Aircraft* that expert witnesses testified for the Government in support of its "economic family" theory. We have no such evidence in the case before us and we find it unnecessary to embrace such a concept because we conclude that the instant case can be decided within the parameters of *Carnation*.

Petitioner, in the instant case, bases its position upon the following arguments: (1) Disallowance of the premiums violates the recognition of legitimate business transactions between separate entities who are members of an affiliated group; (2) other risk shifting among members of an affiliated group is recognized for tax purposes; and (3) our opinion in *Carnation* is either wrong or the facts in *Carnation* are distinguishable from the facts before us in this case. We will discuss these points in inverse order.

We cannot agree that our opinion in *Carnation* was incorrect. The decision was affirmed and the rationale of *Carnation* has been applied by three separate District Courts. *Carnation* has not been criticized by any other courts. We continue to adhere to such rationale and have been shown nothing to convince us that *Carnation* was incorrect or should not be followed.

We likewise hold that the operative facts in the instant case are indistinguishable from the facts in *Carnation*. Petitioner relies heavily upon the fact that it paid in $1 million of capital to Lombardy and had no arrangement to indemnify Fremont for losses. For this fact to be critical, the comparable facts of the funding of the captive in *Carnation* must be critical. They are not. The rationale of *Carnation* is that there was no shifting of 90 percent of the parent's risk of loss. Without quoting at length from our opinion in *Carnation*, suffice it to say that the agreement of Carnation to provide additional capital to Three Flowers was only one of the several factors upon which we concluded there was not the requisite shifting of risk to constitute insurance for purposes of deducting insurance premiums. The financial viability of the captive

insurance subsidiary is not controlling. The test continues to be whether, considering all of the facts, the risk of loss was shifted away from the taxpayer who seeks to deduct insurance premiums.

The interdependence of all of the agreements is relevant here as the Supreme Court held that it was in *Le Gierse* (see discussion on page 955 *supra*) and as we held that it was in *Carnation*, see quote at page 955 *supra*. The execution dates certainly confirm their interdependence as demonstrated below:

Feb.   3, 1978 ...................Lombardy executed reinsurance agreement with Fremont effective Jan. 1, 1978

Mar. 22, 1978 ...................Fremont executed reinsurance agreement which Lombardy executed on Feb. 3, 1978

Apr. 24, 1978 ...................Fremont issued insurance policy to petitioner covering the period from Jan. 1, 1978, to Jan. 1, 1979, effective Jan. 1, 1978

1978 ...................Fremont notified the Division of Self Insurance of the State of California that it had issued a valid workers' compensation insurance policy to petitioner for the years 1978 and 1979

Jan. 24, 1979 ...................The insurance policy issued by Fremont to petitioner is renewed for 1 year, effective Jan. 1, 1979

Petitioner argues that other shifts of risk among members of an affiliated group are recognized for tax purposes. That is true. Indeed, that is one of the reasons we are reluctant to embrace the "economic family" concept urged by respondent, because such a concept cannot be reconciled with types of transactions between related entities other than insurance.

Shifting of risk in transactions other than insurance are simply not relevant here. We are concerned only with the deductibility of insurance premiums. The cost of insurance is represented by the insurance premium. Accordingly, to deduct insurance premiums it is essential to decide whether the relationship giving rise to the payment constitutes insurance.[4]

The limit of our inquiry is the deductibility of premiums paid for insurance coverage. We pointed out in *Carnation* at

---

[4]This means the "true assumption of the risk of loss." *Surety Insurance Co. of California v. Commissioner*, T.C. Memo. 1980–70.

page 413 of 71 T.C. that we did not see how *Le Gierse* has any application beyond insurance premiums. Our holding in *Carnation* and our holding here is likewise limited to the deduction for insurance premiums. It has long been decided that a taxpayer cannot deduct as insurance premiums amounts set aside in its own possession to compensate itself for perils which are generally the subject of insurance. In *Pan-American Hide Co. v. Commissioner*, 1 B.T.A. 1249, 1250 (1925), the deduction was disallowed because the law did not permit a taxpayer to deduct as an expense an amount it feared may some day be called upon to spend. The law has not changed. Even if the taxpayer cannot obtain insurance to cover the peril, the amount set aside as self-insurance is not deductible. *L.A. Thompson Scenic Railway v. Commissioner*, 2 B.T.A. 664 (1925).

It is undisputed that the definition of insurance means the shifting of risk and that the insurance premium is the cost of providing for the shifting of risk. See *Steere Tank Lines, Inc. v. United States*, 577 F.2d 279 (5th Cir. 1978). The insurance premium is the measure by which unrelated parties calculate the cost of the risk being assumed by the insurance company. The agreement by which Lombardy was to receive from Fremont 92 percent of the premiums which petitioner paid to Fremont, the unrelated party, measured that portion of the total risk of Fremont assumed by Lombardy, petitioner's captive insurance company. The question is, therefore, whether this 92 percent of the premiums paid by petitioner is, in reality, insurance premiums. Under the definition of insurance, such payments do not *constitute* insurance premiums unless they are paid to shift risk away from the taxpayer who seeks to deduct them. This portion of the amounts paid to Fremont which were ceded to Lombardy must *constitute* insurance premiums to be deductible. They are not insurance premiums unless they pay for a shift away from petitioner of 92 percent of petitioner's risk of loss.

When petitioner sustains losses covered by its workers' compensation insurance, 92 percent is sustained by Lombardy. Accordingly, because petitioner, through its wholly owned Arizona corporation, owns all of Lombardy, it has not shifted the risk of sustaining such losses to unrelated parties in exchange for insurance premiums because the premiums were

paid to the wholly owned subsidiary of its wholly owned subsidiary. We reiterate that it is unnecessary to use the term "economic family" in resolving the issue because it might foster a theory which would be extended to other areas of the tax law.[5] We hasten to point out, nevertheless, that parents and wholly owned subsidiaries are involved in *Carnation* and here. We express no opinion, however, as to situations where the taxpayer does not completely own the subsidiary.

We found in *Carnation*, as we find here, that to the extent the risk was not shifted, insurance does not exist and the payments to that extent are not insurance premiums. The measure of the risk shifted is the percentage of the premium not ceded. This is nothing more than a *recharacterization* of the payments which petitioner seeks to deduct as insurance premiums.

Petitioner argues that our holding in *Carnation* disregards the separate nature of the corporate entities involved, citing *Moline Properties v. Commissioner*, 319 U.S. 436 (1943). Such an argument is contrary to what we said at page 408 of 71 T.C.:

> The foregoing analysis of *Le Gierse* reveals that the Court considered together two related agreements between unrelated parties. The Court's opinion is not premised on its disregarding the separateness of the parties to the agreements. *We conclude that the application of Le Gierse to the facts of the instant case will be equally valid whether or not Three Flowers and Carnation are separate entities for tax purposes.* [Emphasis added.]

We reaffirm the quotation from *Carnation* that if the holding of *Le Gierse* applies, it applies regardless of whether or not Carnation and Three Flowers were considered separate entities for tax purposes.

It has been 6 years since we decided *Carnation*. The separate entity argument was argued and disposed of in *Beech Aircraft Corp. v. United States*, *supra*, and *Crawford Fitting Co. v. United States*, *supra*. The taxpayers continue to argue the theory in undecided cases which have been submitted to us. We, therefore, deem it appropriate to explain in more detail why we conclude that the separate nature of the corporate entities has not been disregarded in applying *Le Gierse*.

---

[5]At page 956 *supra*, we pointed out that there was no testimony in this case as to "economic family." We do not imply that such a concept might be considered in situations other than captive insurance if expert testimony were offered.

There are numerous situations in the tax law, both statutory and case law, where the separate nature of the entity is not disregarded but the transaction, as cast between the related parties, is reclassified to represent something else, e.g., reasonable compensation or dividend, loans or contributions to capital, loans or dividends, deposits or payments, or other recharacterization such as permitted under section 482, Internal Revenue Code of 1954, as amended. We have done nothing more in *Carnation* and here but to reclassify, as nondeductible, portions of the payments which the taxpayers deducted as insurance premiums but which were received by the taxpayer's captive insurance subsidiaries.

The only insurance business which Lombardy had was that of petitioner. We expressly decline to decide in this case how the result might be affected, if at all, if the captive insurance company had insurance business from unrelated customers.

We, therefore, under the authority of *Carnation*, sustain respondent's determination in denying 92 percent of petitioner's deductions for insurance premiums on its workers' compensation insurance. To reflect an alternative deduction which respondent does not dispute,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

DAWSON, FAY, SIMPSON, STERRETT, CHABOT, PARKER, and COHEN, *JJ.*, agree with the majority opinion.

NIMS, *J.*, did not participate in the consideration of this case.

———

WHITAKER, *J.*, concurring: As the majority points out, a taxpayer which self-insures cannot deduct sums set aside as a reserve for payment of unmatured claims, whether or not roughly equivalent to premiums for insurance against the particular risks. *Pan-American Hide Co. v. Commissioner*, 1 B.T.A. 1249, 1250 (1925); *L.A. Thompson Scenic Railway v. Commissioner*, 2 B.T.A. 664 (1925). By analogy see *Crescent Wharf & Warehouse Co. v. Commissioner*, 59 T.C. 751 (1973), revd. 518 F.2d 772 (9th Cir. 1975). It is too obvious for discussion that generally a taxpayer cannot be allowed to do

indirectly through a wholly owned subsidiary that which it is prohibited from doing directly. Hence by merely qualifying a subsidiary as an insurance company, a parent cannot deduct sums equivalent to insurance premiums which it pays to its subsidiary. And the same tax analysis must apply where the premiums are paid indirectly to the subsidiary as reinsurance. *Carnation (Carnation Co. v. Commissioner,* 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981)) in my judgment really stands for this proposition and it is time we said so. It is on this basis that I would hold petitioner is precluded from deducting the premiums paid to Fremont to the extent of the 92 percent that by prearrangement was returned to its subsidiary Lombardy, the sole business of which was reinsurance of petitioner's insurance with Fremont. We do not have before us other fact situations such as those postulated by the dissent. Resolution of those different and more difficult issues should await another day. "Sufficient unto the day is the evil thereof." 6 Matthew 34.

---

HAMBLEN, *J.,* concurring: I concur in the result reached in this opinion. However, I do not agree with the basis on which this result was reached and believe this opinion has obscured the longstanding analysis of *Helvering v. Le Gierse,* 312 U.S. 531 (1941).

*Helvering v. Le Gierse, supra* at 539, describes a true insurance arrangement as requiring "risk-shifting and risk-distribution." The Court found in that instance that there was no risk-shifting because:

> Here the total consideration was prepaid and exceeded the face value of the "insurance" policy. The excess financed loading and other incidental charges. Any risk that the prepayment would earn less than the amount paid to respondent as an annuity was an investment risk similar to the risk assumed by a bank; it was not an insurance risk as explained above. [*Helvering v. Le Gierse, supra* at 542.]

Subsequently, this Court in *Carnation Co. v. Commissioner,* 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), had the opportunity to examine *Helvering v. Le Gierse, supra,* in the context of a wholly owned subsidiary which reinsured 90 percent of the insurance risk assumed by an unrelated third

party insurance company. In *Carnation Co. v. Commissioner, supra,* the parent corporation had entered into an agreement with the subsidiary which permitted the subsidiary to receive an additional $2,880,000 capital contribution on demand. Clearly, the implication was that, if the premiums paid were inadequate to cover the insurance risks, the insured would, in effect, make up at least a portion of the deficiency through additional capital contributions. We found that the agreement to provide additional capital contributions bound Carnation to an investment risk which neutralized the insurance risk. *Carnation Co. v. Commissioner, supra* at 409.[1] Consequently, we held that there was no risk-shifting to the extent of the reinsurance arrangement.

While I agree with the analysis in *Carnation Co. v. Commissioner, supra,* I cannot agree that the conclusion of that case is controlling here. Unlike the situation in *Carnation Co. v. Commissioner, supra,* there was no requirement that petitioner contribute additional sums to Lombardy. The findings of fact (*supra* p. 953) specifically state:

There was no agreement or understanding between petitioner, its wholly owned subsidiary in Arizona, Hall, or Fremont that petitioner would indemnify Fremont, that it would pay additional capital into Lombardy, or that it would take any steps, direct or indirect, to assure that Lombardy would perform its obligations under its reinsurance agreement with Fremont.

Under the circumstances, I simply cannot agree that no risk-shifting was involved here to the extent of the reinsurance. Petitioner paid sums which were ultimately received by Lombardy, and Lombardy assumed the risk that these sums would not be sufficient to cover all of its liability.

While ostensibly rejecting the "economic family" concept, the opinion in this case seems to me to rely on a similar analysis in order to support the conclusion that there was no risk-shifting. The economic family concept is described in Rev. Rul. 77–316, 1977–2 C.B. 53, 54, which provides in pertinent part:

---

[1]This opinion states that the agreement to provide additional capital was only one factor of several which were considered in the determination made in *Carnation Co. v. Commissioner,* 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981). However, review of that opinion discloses to me no other factor articulated as a basis for the opinion.

the insuring parent corporation and its domestic subsidiaries, and the wholly owned "insurance" subsidiary, though separate corporate entities, represent one economic family with the result that those who bear the ultimate economic burden of loss are the same persons who suffer the loss. To the extent that the risks of loss are not retained in their entirety by * * * or reinsured with * * * insurance companies that are unrelated to the economic family of insureds, there is no risk-shifting or risk-distribution, and no insurance, the premiums for which are deductible under section 162 of the Code.

In the situation where the insurer is wholly owned by the insured, either directly or indirectly, I can see little difference between the economic family concept described in the revenue ruling and the conclusion in this case that (p. 958):

When petitioner sustains losses covered by its workers' compensation insurance, 92 percent is sustained by Lombardy. Accordingly, because petitioner, through its wholly owned Arizona corporation, owns all of Lombardy, it has not shifted the risk of sustaining such losses to unrelated parties in exchange for insurance premiums because the premiums were paid to the wholly owned subsidiary of its wholly owned subsidiary.

In any event, both analyses appear to be directly contrary to the holding of *Moline Properties v. Commissioner*, 319 U.S. 436 (1943), and may not, in my opinion, be sustained on that basis alone.[2] The *Moline Properties* issue is unnecessarily injected into this case via the economic family concept analogy.

My conclusion in this case is that the insurance arrangement with Lombardy did effectively shift the insured risk from petitioner to Lombardy. However, the arrangement is not a true insurance arrangement because there is no risk distribution. Risk distribution may be described as:

a method of dispelling the danger of a potential loss *by spreading its cost throughout a group*. By diffusing the risks through a mass of separate risk shifting contracts, the insurer casts his lot with the law of averages. [*Commissioner v. Treganowan*, 183 F.2d 288, 291 (2d Cir. 1950). Emphasis added.]

Clearly , there is no risk distribution here because there is only one insured and, consequently, there can be no spreading of

---

[2]See Tinsley, Why Revenue Ruling 77–316 Is Wrong: A Captivating Argument, 9 Jour. of Corp. Tax. 142 (1982).

the exposure.[3]

Finally, the opinion notes that it will save for another day resolution of the insurance issue where a subsidiary insures risks other than those of its parent. I respectfully submit, however, that this merely begs the question, because one issue will be there, as it is here, whether a distribution as well as a shifting of risk has occurred. Accordingly, I would apply here the insurance definition in *Helvering v. Le Gierse, supra*, and resolve the issue on that basis. Hopefully, we can then put to rest the economic family concept, at least in this Court.[4]

JACOBS, *J.*, concurring: I concur in the result reached by the majority but not in the majority's reasoning.

As the majority recognizes, a deduction for contributions to reserves for self-insurance is not allowable under section 162. What one may not do directly cannot be done circuitously. On the facts before us—a wholly owned subsidiary whose only business is that of insuring its ultimate parent—the circuitous attempt to side-step the prohibition against a deduction for self-insurance is obvious. To borrow from an old television comedy program, a rabbit wearing a sign that reads "chinchilla," in a cage marked "chinchilla cage," and eating food denoted as "chinchilla food," is nevertheless a rabbit.

I do not espouse the economic family theory (as apparently adopted by the majority) since to do so would deny a deduction for a premium paid under an otherwise valid insurance arrangement solely because of the relationship between the insured and the insurer. Nor do I subscribe to the position that, in every case in which the insured's policy is the only policy issued by the insurance company, the lack of risk distribution, standing alone, is a sufficient ground for denying a deduction for the premium paid. My position is simply that where both the insurance company is ultimately wholly owned

---

[3]Although any employee entitled to compensation may enforce the liability of any insurer under sec. 3753 of the California Labor Code, it is the employer's obligation to the employees, i.e., the risk, under sec. 3600 of the California Labor Code, which is insured.

[4]Indeed the Internal Revenue Service has clarified its position in Rev. Rul. 77-316, 1977-2 C.B. 53, and eliminated the application of the economic family concept where there are numerous insured shareholders, none of whom owns a controlling interest in the insurance corporation. See Rev. Rul. 80-120, 1980-1 C.B. 41; Rev. Rul. 78-338, 1978-2 C.B. 107.

by the insured and the only policy issued by the insurance company is to its parent corporation, it defies logic to consider such an arrangement as anything other than self-insurance. What may be the outcome in another case presenting different facts must be left for another time.

---

GERBER, *J.*, dissenting: The majority has transcended the natural boundaries of the holding in *Carnation Co. v. Commissioner*, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981), and has incorrectly applied the rule of law in *Helvering v. Le Gierse*, 312 U.S. 531 (1941), upon which *Carnation* is based. I further disagree with the majority's statement that "the operative facts in the instant case are indistinguishable from the facts in *Carnation.*" In essence, the majority has adroitly avoided the result which should occur by applying *Carnation* and *Le Gierse* to the facts of this case.

*Le Gierse*, a narrowly drawn holding of limited application, stands for the principle that an insurance relationship does not exist where the risk does not shift from the "insured" to an insurer. In *Le Gierse*, offsetting annuity and life insurance contracts, measured by the same life, were found to be insufficient to transfer or shift the risk of loss from the insured to the insurer.

In *Carnation*, a wholly owned offshore captive insurance company reinsured 90 percent of the risk which its parent placed with an unrelated insurer. Only $120,000 of $3 million in authorized capital had been contributed to the captive. The unrelated insurer would not reinsure with Carnation's captive unless Carnation agreed to pay the $2,880,000 unpaid portion of the captive's capital upon demand, if the captive was required to pay claims on the risks of Carnation. The essence of these transactions is that Carnation would be paying claims against it by means of "contributions" to capital as the claims arose. Thus, the contract to insure followed by the 90-percent reinsurance with the captive subsidiary was offset by Carnation's agreement to pay additional capital or indemnify for its own losses. This application of *Le Gierse* is axiomatic inasmuch as no risk shifted to the captive. It is to be noted, however, that "The key was that [the unrelated insurer] refused to enter into the reinsurance contract with [the captive subsidiary of

Carnation] unless Carnation agreed to capitalize [the captive]." *Carnation Co. v. Commissioner*, 640 F.2d at 1013.

Since the transaction in *Carnation* did not result in a shifting of the risk, 90 percent of the premiums (the amount reinsured) did not constitute insurance but was self-insurance[1] and not deductible. This result could be and properly was accomplished without questioning the separate corporate existence of the captive subsidiary. The validity of the insurance and reinsurance contracts was not in question. Further, no determinations or findings were made concerning the captive's status as an insurance company, either under the law of the situs or within the meaning of sections 801 et seq. of subchapter L, chapter 1, Internal Revenue Code.

The majority would now have us believe that the indemnification agreement in *Carnation* was not a critical factor and instead focuses our attention on the conclusion that the risk did not shift. This circuitous approach ignores the express holdings of *Le Gierse* and *Carnation*. The majority then states that "The test continues to be whether, considering all of the facts, the risk of loss [has] shifted away from the taxpayer who seeks to deduct insurance premiums." The majority correctly states the test established in prior cases to be that an insurance relationship has not arisen if the risk has not shifted under the facts and circumstances. The majority then mystically espouses a factual pattern where the test cannot be met (p. 958):

When petitioner sustains losses covered by its workers' compensation insurance, 92 percent is sustained by Lombardy. Accordingly, because petitioner, through its wholly owned Arizona corporation, owns all of Lombardy, it has not shifted the risk of sustaining such losses to unrelated parties in exchange for insurance premiums because the premiums were paid to the wholly owned subsidiary of its wholly owned subsidiary.

This explanation presents a completely new theory which has no roots in *Le Gierse* or *Carnation* and is without support in existing statute or case law. In essence, this new theory would disallow a deduction solely because of the ownership relationship between an insured and insurer. It assumes that

---

[1] In order to find that petitioner was self-insuring, we would be required to either find some form of indemnification, as in *Carnation*, or offset, as in *Le Gierse*, or disregard Lombardy's separate corporate existence.

no risk can shift between related corporate entities. Although the majority expressly disclaims respondent's concept of "economic family" (see Rev. Rul. 77–316, 1977–2 C.B. 53), the theories are the same. The agreement to limit the application of the theory to insurance transactions does not cure its inherent deficiencies. There is no explanation as to the reason or principle that automatically precludes insurance between related entities. Additionally, the majority has stated, but not explained, how it is able to disregard the transactions in this case without crashing head on into the holding in *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943). Petitioner, in this case, has not elected to file a consolidated return and there is no reason to disregard the separate existence of Lombardy.

The only fact that the majority emphasizes as supporting a finding that the risk did not shift is that the sequence of executing the contracts reflects an interdependence of the agreements. I am not able to understand how that finding affects the quality of the contractual relationship or can be a basis for concluding that the risk did not shift. All mutual contractual obligations are by their very nature interdependent, and a party to a contract is not likely to be unilaterally bound or bound in a time sequence to his detriment.

The majority has found that no risk shifted and has also found the following facts which do not support such a finding: (1) There was no agreement or understanding that petitioner would indemnify Fremont or pay additional capital into Lombardy or would take any step to assure Lombardy's performance; (2) Lombardy was fully capitalized with $1 million of paid-up capital, an amount which exceeded the State of Colorado's statutory minimum requirement; (3) Lombardy was recognized, following an audit and certification, by the State of Colorado as an insurance company; (4) the States of California and Colorado either approved or established the rates of premiums for insurance and reinsurance between petitioner, Fremont, and Lombardy; and (5) Fremont (an unrelated California insurance company) remained primarily obligated to pay any workers' compensation claims against petitioner, if Lombardy failed, or was unable, to do so.

Under these and other facts stipulated by the parties, it is most difficult to understand how the risk did not shift from

petitioner to the insurer and reinsurer. To conclude that the risk did not shift because of petitioner's stock ownership or any shareholder control is without foundation and may require ignorance of a corporate existence. The facts in this case clearly show that petitioner no longer would bear the risk of loss and did not have direct control over the assets of Lombardy, especially those assets jointly held with the State of Colorado. It is important to note that Fremont would be obligated to pay any workers' compensation claims which Lombardy failed to pay.[2] Further, the majority appears unable to explain why risk does not shift in an insurance setting, when risk would shift with respect to all other business transactions between related taxpayers. Neither the majority nor the respondent has provided any persuasive arguments or compelling reasons to deny the possibility of an insurance relationship between related taxpaying entities.

How will courts apply the majority's rationale where: (1) The parent owns less than 100 percent of the captive; (2) the parent is the insurer rather than the insured; (3) less than all of the captive-subsidiary's insurance business is with the parent (cf. *Crawford Fitting Co. v. United States*, 606 Fed. Supp. 136 (N.D. Ohio 1985)); (4) the parent's claims paid by the subsidiary exceed the premiums paid by the parent; or (5) the insurance contract is between corporations related as brother-sister. One might boggle his imagination trying to determine whether the shareholders-insureds of a mutual insurance company could shift risk to their corporation.

---

[2]Petitioner was required by statute to either self-insure or obtain insurance from a California authorized compensation carrier. Cal. Lab. Code sec. 3700 (West 1971). Petitioner's employees have a direct right of suit against Fremont. Cal. Lab. Code sec. 3753. In California, the employer may be relieved from any claim filed against it and the insurer is substituted in the employer's place. Cal. Lab. Code sec. 3755. Fremont, as the "insurer" under the laws of the State of California, was primarily liable for the payment of compensation of petitioner's employees. *Fireman's Fund Indemnity Co. v. State Industrial Accident Commission*, 39 Cal. 2d 831 (1952). Fremont remained primarily liable under California law, but was entitled to reinsure. To the extent the reinsurer became insolvent or unable to pay compensation claims, Fremont, not petitioner, was obligated to pay the claims. If both Fremont and Lombardy were unable to pay claims, the compensation claims would be paid from California's State Compensation Insurance Fund (Cal. Ins. Code secs. 11690 et seq., and 11770 et seq. (West 1972)), or from the California Insurance Guarantee Association (Cal. Ins. Code sec. 1063 (West 1972)), depending upon the circumstances. These special features of workers' compensation statutes make it especially clear that petitioner shifted the risk from itself and that petitioner's operating assets and capital would not be subject to claims for which premiums were paid to Fremont, whether or not the insurance coverage had been reinsured with Lombardy.

Although two District Courts have unquestioningly followed the respondent's and majority's theory, they leave the same questions unanswered and provide no better rationale than that offered by the majority. I respectfully dissent because the majority, in creating this new theory, has chosen to follow a path which is not in accord with precedent, and transcends established principles of law.

WILBUR, KÖRNER, SHIELDS, CLAPP, SWIFT, and WRIGHT, *JJ*, agree with this dissent.