RENT-A-CENTER, INC. AND AFFILIATED SUBSIDIARIES, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8320–09, 6909–10, 21627–10.          Filed January 14, 2014.

P, a domestic corporation, is the parent of numerous wholly owned subsidiaries including L, a Bermudian corporation. P conducted its business through stores owned and operated by its subsidiaries. The other subsidiaries and L entered into contracts pursuant to which each subsidiary paid L an amount, determined by actuarial calculations and an allocation formula, relating to workers' compensation, automobile, and general liability risks, and, in turn, L reimbursed a portion of each subsidiary's claims relating to these risks. P's subsidiaries deducted, as insurance expenses, the payments to L. In notices of deficiency issued to P, R determined that the payments were not deductible. *Held*: P's subsidiaries' payments to L are deductible, pursuant to I.R.C. sec. 162, as insurance expenses.

*Val J. Albright* and *Brent C. Gardner, Jr.*, for petitioners.
*R. Scott Shieldes* and *Daniel L. Timmons*, for respondent.

FOLEY, *Judge*: Respondent determined deficiencies of $14,931,159, $13,409,628, $7,461,039, $5,095,222, and $2,828,861 relating, respectively, to Rent-A-Center, Inc. (RAC), and its subsidiaries' 2003,[1] 2004, 2005, 2006, and 2007 (years in issue) consolidated Federal income tax returns. The issue for decision is whether payments to Legacy Insurance Co., Ltd. (Legacy), were deductible, pursuant to section 162,[2] as insurance expenses.

FINDINGS OF FACT

RAC, a publicly traded Delaware corporation, is the parent of a group of approximately 15 affiliated subsidiaries (collec-

_____

[1] Respondent, in his amended answer, asserted an additional $2,603,193 deficiency relating to 2003.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

1

tively, petitioner). During the years in issue, petitioner was the largest domestic rent-to-own company. Through stores owned and operated by RAC's subsidiaries, petitioner rented, sold, and delivered home electronics, furniture, and appliances. The stores were in all 50 States, the District of Columbia, Puerto Rico, and Canada. From 1993 through 2002, petitioner's company-owned stores increased from 27 to 2,623. During the years in issue, RAC's subsidiaries owned between 2,623 and 3,081 stores; had between 14,300 and 19,740 employees; and operated between 7,143 and 8,027 insured vehicles.

I. *Petitioner's Insurance Program*

In 2001, American Insurance Group (AIG), in response to a claim against RAC's directors and officers (D&O), withdrew a previous offer to renew RAC's D&O insurance policy. To address this problem, RAC engaged Aon Risk Consultants, Inc. (Aon), which convinced AIG to renew the policy. Impressed with Aon's insurance expertise and concerned about its growing insurance costs, petitioner engaged Aon to analyze risk management practices and to broker workers' compensation, automobile, and general liability insurance. With Aon's assistance, petitioner developed a risk management department and improved its loss prevention program.

Prior to August 2002, Travelers Insurance Co. (Travelers) provided petitioner's workers' compensation, automobile, and general liability coverage through bundled policies. Pursuant to a bundled policy, an insurer provides coverage and controls the claims administration process (i.e., investigating, evaluating, and paying claims). Travelers paid claims as they arose and withdrew amounts from petitioner's bank account to reimburse itself for any claims less than or equal to petitioner's deductible (i.e., a portion of an insured claim for which the insured is responsible). Pursuant to a predetermined formula, each store was allocated, and was responsible for paying, a portion of Travelers' premium costs.

In 2001, after receiving a $3 million invoice from Travelers for "claim handling fees", petitioner became dissatisfied with the cost and inefficiency associated with its bundled policies. On August 5, 2002, petitioner, with the assistance of Aon, obtained unbundled workers' compensation, automobile, and

general liability policies from Discover Re. Pursuant to an unbundled policy, an insurer provides coverage and a third-party administrator manages the claims administration process. Discover Re underwrote the policies; multiple insurers provided coverage;[3] and Specialty Risk Services, Inc. (SRS),[4] a third-party administrator, evaluated and paid claims. Petitioner and its staff of licensed adjusters had access to SRS' claims management system and monitored SRS to ensure the proper handling of claims. This arrangement gave petitioner greater control over the claims administration process.

Petitioner, pursuant to the Discover Re policies' deductibles, was liable for a specific amount of each claim against its workers' compensation, automobile, and general liability policies (e.g., pursuant to its 2002 workers' compensation policy, petitioner was liable for the first $350,000 of each claim). Petitioner's retention of a portion of the risk resulted in lower premiums.

II. *Legacy's Inception*

Between 1993 and 2002, petitioner rapidly expanded and became increasingly concerned about its growing risk management costs. In 2002, after analyzing petitioner's insurance program, Aon suggested that petitioner form a wholly owned insurance company (i.e., a captive). Aon representatives informed David Glasgow, petitioner's director of risk management, about the financial and nonfinancial benefits of forming a captive. Aon convincingly explained that a captive could help petitioner reduce its costs, improve efficiency, obtain otherwise unavailable coverage, and provide accountability and transparency. Mr. Glasgow presented the proposal to petitioner's senior management, who concurred with Mr. Glasgow's recommendation to further explore the formation of a captive. Petitioner's senior management directed Aon to conduct a feasibility study (i.e., relying on petitioner's workers' compensation, automobile, and general

---

[3] The following insurers provided coverage: U.S. Fidelity & Guarantee Co., Fidelity & Guaranty Insurance Co., Discover Property and Casualty Insurance Co., St. Paul Fire & Marine Co. of Canada, and Fidelity Guaranty Insurance Underwriters Inc.

[4] SRS was affiliated with the Hartford Insurance Co., a well-established insurer, and did not have a contract with Discover Re.

liability loss data) and to prepare loss forecasts and actuarial studies. Petitioner engaged KPMG to analyze the feasibility study, review tax considerations, and prepare financial projections.

Aon, in the feasibility study, recommended that the captive be capitalized with no less than $8.8 million. Before deciding where to incorporate the captive, RAC analyzed projected financial data and reviewed multiple locations. On December 11, 2002, RAC incorporated, and capitalized with $9.9 million,[5] Legacy, a wholly owned Bermudian subsidiary.[6] Legacy opened an account with Bank of N.T. Butterfield and Son, Ltd., and, on December 20, 2002, filed a class 1 insurance company registration application with the Bermuda Monetary Authority (BMA), which regulated Bermuda's financial services sector. A class 1 insurer may insure only the risk of its shareholders and affiliates; must be capitalized with at least $120,000; and must meet a minimum solvency margin calculated by reference to the insurer's net premiums, general business assets,[7] and general business liabilities. *See* Insurance Act, 1978, secs. 4B, 6, Appleby (2008) (Berm.); Insurance Returns and Solvency Regulations, 1980, Appleby, Reg. 10(1), Schedule I, Figure B (Berm.). During the years in issue, the BMA had the authority to modify prescribed requirements through both prospective and retroactive directives for special allowances. *See* Insurance Act, 1978, sec. 56.

Legacy planned to insure petitioner's liabilities for the period beginning in 2002 and ending December 31, 2003 (proposed period). Aon informed petitioner that coverage pro-

---

[5] RAC contributed $9.9 million of cash and received 120,000 shares of Legacy capital stock with a par value of $1.

[6] Legacy elected, pursuant to sec. 953(d), to be treated as a domestic corporation for Federal income tax purposes. In addition, Legacy engaged Aon Insurance Managers (Bermuda), Ltd., to monitor Legacy's compliance with Bermudian regulations and to provide management, financial, and administrative services.

[7] The Bermuda Insurance Act, the Insurance Accounts Regulations, and the Insurance Returns and Solvency Regulations reference "general business", "admitted", and "relevant" assets. *See* Insurance Act, 1978, sec. 1, Appleby (2008) (Berm.); Insurance Accounts Regulations, 1980, Appleby, Schedule III, Pt. 1, 13 (Berm.); Insurance Returns and Solvency Regulations, 1980, Appleby, Reg. 10(3), 11(4) (Berm.). For purposes of this Opinion, there is no significant difference among these terms.

vided by unrelated insurers would be more costly than Aon's estimate of Legacy's premiums and that some insurers would not be willing to offer coverage. In response to a quote request, Discover Re stated that it was not in the market to provide the coverage Legacy contemplated. Discover Re estimated, however, that its premium (i.e., if it were to write one relating to the proposed period) would be approximately $3 million more than Legacy's.

III. *Petitioner's Policies*

During the years in issue, petitioner obtained unbundled workers' compensation, automobile, and general liability policies from Discover Re. Pursuant to these policies, Discover Re provided petitioner with coverage above a predetermined threshold relating to each line of coverage. In addition, Legacy wrote policies that covered petitioner's workers' compensation, automobile, and general liability claims below the Discover Re threshold. Petitioner, depending on the amount of a covered loss, could seek payment from Legacy, Discover Re, or both companies.

The annual premium Legacy charged petitioner was actuarially determined using Aon loss forecasts and was allocated to each RAC subsidiary that owned covered stores. RAC was a listed policyholder pursuant to the Legacy policies. No premium was attributable to RAC, however, because it did not own stores, have employees, or operate vehicles. RAC paid the premiums relating to each policy,[8] estimated petitioner's total insurance costs (i.e., Legacy policies, Discover Re policies, third-party administrator fees, overhead, etc.), and established a monthly rate relating to each store's portion of these costs. The monthly rate was based on three factors: each store's payroll, each store's number of vehicles, and the total number of stores. At the end of each year, RAC adjusted the allocations to ensure that its subsidiaries recognized their actual insurance costs. SRS administered all claims relating to petitioner's workers' compensation, auto-

---

[8] From December 31, 2002, through September 12, 2003, Legacy incurred a $4,861,828 liability relating to claim reimbursements due petitioner. This amount was netted against petitioner's September 12, 2003, premium payment (i.e., petitioner paid a net premium of $37,938,472 rather than the $42,800,300 gross premium).

mobile, and general liability coverage. During the years in issue, the terms of Legacy's coverage varied, Legacy progressively covered greater amounts of petitioner's risk, and Legacy did not receive premiums from any unrelated entity. From December 31, 2002, through December 30, 2007, Legacy earned net underwriting income of $28,761,402. *See infra* p. 10.

A. *Legacy's Deferred Tax Assets*

Pursuant to the Legacy policies, coverage began on December 31 of each year. Because petitioner was a calendar year accrual method taxpayer, these policies created temporary timing differences between income recognized for tax purposes and income recognized for financial accounting (book) purposes.[9] For example, on December 31, 2002, when Legacy's second policy became effective, Legacy recognized, for tax purposes, the full amount of the premium (i.e., $42,800,300) relating to the taxable year ending December 31, 2002. *See* sec. 832(b)(4). For book purposes, however, Legacy in 2002 recognized only 1/365 of the premium (i.e., $117,261), and the remaining $42,683,039 constituted a reserve. This timing difference created a deferred tax asset (DTA) because in 2002 Legacy "prepaid" its tax liability relating to income it recognized, for book purposes, in 2003. Each day Legacy recognized a portion of its premium income (i.e., $117,261) for book purposes and reduced its reserve by the same amount. On December 30, 2003, the reserve was fully depleted. Upon the issuance of a new policy on December 31, 2003, a new DTA was created because Legacy recognized, for tax purposes, in 2003 the full amount of the premium; a corresponding tax liability was incurred; the premium reserve increased; and most of the premium income attributable to the 2003 policy was recognizable, for book purposes, in 2004.

---

[9] Each premium was generally paid in September of the year following the year in which the policy became effective. Use of the recurring item exception allowed petitioner to claim a premium deduction relating to the year in which the policy became effective, rather than the following year when the premium was actually paid. *See* sec. 461(h)(3)(A)(iii). On August 28, 2007, petitioner filed Form 3115, Application for Change in Accounting Method, requesting permission to revoke its use of the recurring item exception.

### 1. *Bermuda's Minimum Solvency Margin Requirement*

Pursuant to the Bermuda Insurance Act, an insurance company must maintain a minimum solvency margin. *See* Insurance Act, 1978, sec. 6. More specifically, a class 1 insurer's general business assets must exceed its general business liabilities by the greatest of: $120,000; 10% of the insurer's loss and loss expense provisions plus other insurance reserves; or 20% of the first $6 million of net premiums plus 10% of the net premiums which exceed $6 million. *See* Insurance Returns and Solvency Regulations, 1980, Appleby, Reg. 10(1), Schedule I, Figure B. DTAs generally may be treated as general business assets only with the BMA's permission.

### 2. *Legacy Receives Permission To Treat DTAs as General Business Assets Through 2003*

In the minimum solvency margin calculation set forth in its insurance company registration application, Legacy treated DTAs as general business assets. On March 11, 2003, Legacy petitioned the BMA for the requisite permission to do so. The following letter from RAC accompanied the request:

> We write to confirm to you that Rent-A-Center, Inc., * * * will guarantee the payment to Legacy Insurance Company, Ltd. (the "Company"), * * * of all amounts reflected on the projected balance sheets of the Company previously delivered to you as deferred tax assets arising from timing differences in the amounts of taxes payable for tax and financial accounting purposes. This guaranty of payment will take effect in the event of any change in tax laws that would require recognition of an impairment of the deferred tax asset, and will be effective to the extent of the amount of the impairment.

On March 13, 2003, the BMA granted Legacy permission to treat DTAs as general business assets on its statutory balance sheet through December 31, 2003.[10] The BMA also informed Legacy that from December 31, 2002, through March 13, 2003, it "wrote insurance business without being in receipt of its Certificate of Registration and was therefore in violation of the [Bermuda Insurance] Act as it engaged in insurance business without a license." Despite this violation, the BMA registered Legacy as a class 1 insurer effective

---

[10] *See infra* pp. 9–10.

December 20, 2002 (i.e., the date Legacy filed its insurance registration request and before it issued policies relating to the years in issue).

3. *The Parental Guaranty: Facilitating the Treatment of DTAs as General Business Assets Through 2006*

In response to the recurring DTA issue, Legacy requested that RAC guarantee DTAs relating to subsequent years. On September 17, 2003, RAC's board of directors authorized the execution of a guaranty of "the obligations of Legacy to comply with the laws of Bermuda." On the same day, RAC's chairman and chief executive officer executed a parental guaranty and sent it to Legacy's board of directors. The parental guaranty provided:

> The undersigned, Rent-A-Center, Inc. a Delaware corporation ("Rent-A-Center") is sole owner of 100% of the issued and outstanding shares in your share capital and as such DOES HEREBY GUARANTEE financial support for you, Legacy Insurance Co., Ltd., * * * and for your business, as more particularly set out below, which is to say:
>
> Under the [Bermuda] Insurance Act * * * and related Regulations (the "Act"), Legacy Insurance Co., Ltd., must maintain certain solvency and liquidity margins and, in order to ensure continued compliance with the Act, it is necessary to support Legacy Insurance Co., Ltd. with a guarantee of its liabilities under the Act (the "Liabilities") not to exceed Twenty-Five Million US dollars (US $25,000,000).
>
> Accordingly, Rent-A-Center DOES HEREBY GUARANTEE to you the payment in full of the Liabilities of Legacy Insurance Co., Ltd. and further to indemnify and hold harmless Legacy Insurance Co., Ltd. from the Liabilities up to the maximum dollar amount [$25,000,000] indicated in the foregoing paragraph.

Seeking regulatory approval to treat DTAs as general business assets in subsequent years, Legacy, on October 30, 2003, petitioned the BMA and attached the parental guaranty.

On November 12, 2003, the BMA issued a directive which "approved the Parental Guarantee from Rent-A-Center, Inc. dated 17th September, 2003 up to an aggregate amount of $25,000,000 for utilization as part of * * * [Legacy]'s capitalization". This approval was granted for the years ending December 31, 2003, 2004, 2005, and 2006. Legacy used the parental guaranty only to meet the minimum solvency

margin (i.e., to treat DTAs as general business assets). [11] On December 30, 2006, RAC unilaterally canceled the parental guaranty because Legacy met the minimum solvency margin without it.

### B. *Legacy's Ownership of RAC Treasury Shares*

Legacy purchased RAC treasury shares during 2004, 2005, and 2006. The BMA approved the purchases and allowed Legacy to treat the shares as general business assets for purposes of calculating its liquidity ratio (i.e., its ratio of general business assets to liabilities). Pursuant to Bermuda solvency regulations, an insurer fails to meet the liquidity ratio if the value of its general business assets is less than 75% of its liabilities. *See* Insurance Returns and Solvency Regulations, 1980, Appleby, Reg. 11(2). During the years in issue, Legacy met its liquidity ratio and did not resell the shares.

### C. *Legacy's Financial Reports*

For each policy period, Legacy's auditor, Arthur Morris & Co. (Arthur Morris), prepared, and provided to RAC and the BMA, reports and financial statements. In these reports and statements, Arthur Morris calculated Legacy's DTAs, [12] minimum solvency margin, [13] premium-to-surplus ratio, [14] and net underwriting income. [15] During each of the years in issue, Legacy's total statutory capital and surplus equaled or exceeded the BMA minimum solvency margin. In calculating total statutory capital and surplus, Arthur Morris took into account the following four components: contributed surplus, statutory surplus, capital stock, and other fixed capital (i.e., assets deemed to be general business assets). During 2003, 2004, and 2005, Legacy included portions of the parental guaranty as general business assets. During the years in

---

[11] *See infra* pp. 9–10.

[12] *See supra* p. 6.

[13] *See supra* p. 7.

[14] Premium-to-surplus ratio is one measure of an insurer's economic performance. On Legacy's reports and statements, Arthur Morris referred to Legacy's premium-to-surplus ratio as the "premium to statutory capital & surplus ratio". For purposes of this Opinion, there is no significant difference between these terms.

[15] Net underwriting income equals gross premiums earned minus underwriting expenses.

issue, the amounts of Legacy's DTAs exceeded the portions of Legacy's parental guaranty treated as general business assets. *See* table *infra*. Arthur Morris calculated Legacy's statutory surplus by adding statutory surplus at the beginning of the year and income for the year, subtracting dividends paid and payable, and making other adjustments relating to changes in assets.

The following table summarizes key details relating to Legacy's policies:

| Policy period | Premium | DTAs | Parental guaranty asset | Total statutory capital & surplus | Minimum solvency margin | Premium-to-surplus ratio | Net underwriting income |
|---|---|---|---|---|---|---|---|
| 2003 | $42,800,300 | $5,840,613 | $4,805,764 | $5,898,192 | $5,898,192 | 8.983:1 | $1,587,542 |
| 2004 | 50,639,000 | 6,275,326 | 4,243,823 | 7,036,573 | 7,036,572 | 7.695:1 | (982,000) |
| 2005 | 54,148,912 | 7,659,009 | 3,987,916 | 8,379,436 | 8,379,435 | 6.369:1 | 8,411,912 |
| 2006 | 53,365,926 | 8,742,425 | -0- | 10,014,206 | 9,284,601 | 6.326:1 | 8,810,926 |
| 2007 | 63,345,022 | 9,689,714 | -0- | 12,428,663 | 10,888,698 | 5.221:1 | 10,933,022 |
| 2008 | 64,884,392 | 9,607,661 | -0- | 23,712,022 | 11,278,359 | 2.538:1 | 18,391,392 |

## IV. *Procedural History*

Respondent sent petitioner, on January 7, 2008, a notice of deficiency relating to 2003; on December 22, 2009, a notice of deficiency relating to 2004 and 2005; and on August 5, 2010, a notice of deficiency relating to 2006 and 2007 (collectively, notices). In these notices, respondent determined that petitioner's payments to Legacy were not deductible pursuant to section 162. On April 6, 2009, March 22, 2010, and September 29, 2010, respectively, petitioner, whose principal place of business was Plano, Texas, timely filed petitions with the Court seeking redeterminations of the deficiencies set forth in the notices. After concessions, the remaining issue for decision is whether payments to Legacy were deductible.

OPINION

In determining whether payments to Legacy were deductible, our initial inquiry is whether Legacy was a bona fide insurance company. *See Harper Grp. v. Commissioner*, 96 T.C. 45, 59 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992); *AMERCO v. Commissioner*, 96 T.C. 18, 40–41 (1991), *aff'd*, 979 F.2d 162 (9th Cir. 1992). We respect the separate taxable treatment of a captive unless there is a finding of sham or lack of business purpose. *See Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 439 (1943); *Harper Grp. v. Commis-*

*sioner*, 96 T.C. at 57–59. Respondent contends that Legacy was a sham entity created primarily to generate Federal income tax savings.

I. *Legacy Was Not a Sham.*

A. *Legacy Was Created for Significant and Legitimate Nontax Reasons.*

After successfully resolving petitioner's D&O insurance problem, Aon evaluated petitioner's risk management department. Petitioner, with Aon's assistance, improved risk management practices, switched from bundled to unbundled policies, and hired SRS as a third-party administrator. Aon proposed that petitioner form a captive, and petitioner determined that a captive would allow it to reduce its insurance costs, obtain otherwise unavailable insurance coverage, formalize and more efficiently manage its insurance program, and provide accountability and transparency relating to insurance costs. Petitioner engaged KPMG to prepare financial projections and evaluate tax considerations referenced in the feasibility study. Federal income tax consequences were considered, but the formation of Legacy was not a tax-driven transaction. *See Moline Props., Inc. v. Commissioner*, 319 U.S. at 439; *Britt v. United States*, 431 F.2d 227, 235–236 (5th Cir. 1970); *Bass v. Commissioner*, 50 T.C. 595, 600 (1968). To the contrary, in forming Legacy, petitioner made a business decision premised on a myriad of significant and legitimate nontax considerations. *See Jones v. Commissioner*, 64 T.C. 1066, 1076 (1975) ("A corporation is not a 'sham' if it was organized for legitimate business purposes or if it engages in a substantial business activity."); *Bass v. Commissioner*, 50 T.C. at 600.

B. *There Was No Impermissible Circular Flow of Funds.*

Respondent further contends that Legacy was "not an independent fund, but an accounting device". In support of this contention, respondent cites a purported "circular flow of funds" through Legacy, RAC, and RAC's subsidiaries. Respondent's expert, however, readily acknowledged that he found no evidence of a circular flow of funds, nor have we. Legacy, with the approval of the BMA, purchased RAC treasury shares but did not resell them. Furthermore, peti-

tioner established that there was nothing unusual about the manner in which premiums and claims were paid. Finally, respondent contends that the netting of premiums owed to Legacy during 2003 is evidence that Legacy was a sham. We disagree. This netting was simply a bookkeeping measure performed as an administrative convenience.

C. *The Premium-to-Surplus Ratios Do Not Indicate That Legacy Was a Sham.*

Respondent emphasizes that, during the years in issue, Legacy's premium-to-surplus ratios were above the ratios of U.S. property and casualty insurance companies and Bermuda class 4 insurers [16] (collectively, commercial insurance companies). On cross-examination, however, respondent's expert admitted that his analysis of commercial insurance companies contained erroneous numbers. Furthermore, he failed to properly explain the profitability data he cited and did not include relevant data relating to Legacy. Moreover, his comparison, of Legacy's premium-to-surplus ratios with the ratios of commercial insurance companies, was not instructive. Commercial insurance companies have lower premium-to-surplus ratios because they face competition and, as a result, typically price their premiums to have significant underwriting losses. They compensate for underwriting losses by retaining sufficient assets (i.e., more assets per dollar of premium resulting in lower premium-to-surplus ratios) to earn ample amounts of investment income. Captives in Bermuda, however, have fewer assets per dollar of premium (i.e., higher premium-to-surplus ratios) but generate significant underwriting profits because their premiums reflect the full dollar value, rather than the present value, of expected losses. Simply put, the premium-to-surplus ratios do not indicate that Legacy was a sham.

D. *Legacy Was a Bona Fide Insurance Company.*

Petitioner presented convincing, and essentially uncontradicted, evidence that Legacy was a bona fide insurance company. As respondent concedes, petitioner faced actual and

---

[16] A class 4 insurance company may carry on insurance business, including excess liability business or property catastrophe reinsurance business. *See* Insurance Act, 1978, sec. 4E.

insurable risk. Comparable coverage with other insurance companies would have been more expensive, and some insurance companies (e.g., Discover Re) would not underwrite the coverage provided by Legacy. In addition, RAC established Legacy for legitimate business reasons, including: increasing the accountability and transparency of its insurance operations, accessing new insurance markets, and reducing risk management costs. Furthermore, Legacy entered into bona fide arm's-length contracts with petitioner; charged actuarially determined premiums; was subject to the BMA's regulatory control; met Bermuda's minimum statutory requirements; paid claims from its separately maintained account; and, as respondent's expert readily admitted, was adequately capitalized. *See Humana Inc. & Subs. v. Commissioner*, 881 F.2d 247, 253 (6th Cir. 1989), *aff'g in part, rev'g in part and remanding* 88 T.C. 197, 206 (1987); *Harper Grp. v. Commissioner*, 96 T.C. at 59. Moreover, the validity of claims Legacy paid was established by SRS, an independent third-party administrator, which also determined the validity of claims pursuant to the Discover Re policies. *See Harper Grp. v. Commissioner*, 96 T.C. at 59. Finally, RAC's subsidiaries did not own stock in, or contribute capital to, Legacy.

II. *The Payments to Legacy Were Deductible Insurance Expenses.*

The Code does not define insurance. The Supreme Court, however, has established two necessary criteria: risk shifting and risk distribution. *See Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941). In addition, the arrangement must involve insurance risk and meet commonly accepted notions of insurance. *See Harper Grp. v. Commissioner*, 96 T.C. at 58; *AMERCO v. Commissioner*, 96 T.C. at 38. These four criteria are not independent or exclusive, but establish a framework for determining "the existence of insurance for Federal tax purposes." *See AMERCO v. Commissioner*, 96 T.C. at 38. Insurance premiums may be deductible. A taxpayer may not, however, deduct amounts set aside in its own possession to compensate itself for perils which are generally the subject of insurance. *See Clougherty Packing Co. v. Commissioner*, 84 T.C. 948, 958 (1985), *aff'd*, 811 F.2d 1297 (9th Cir. 1987). We consider all of the facts and circumstances to determine

whether an arrangement qualifies as insurance. *See Harper Grp. v. Commissioner*, 96 T.C. at 57. Respondent contends that payments to Legacy represent amounts petitioner set aside to self-insure its risks.

A. *The Policies at Issue Involved Insurance Risk.*

Respondent concedes that petitioner faced insurable risk relating to all three types of risk: workers' compensation, automobile, and general liability. Petitioner entered into contracts with Legacy and Discover Re to address these three types of risk. Thus, insurance risk was present in the arrangement between petitioner and Legacy.

B. *Risk Shifting*

We must now determine whether the policies at issue shifted risk between RAC's subsidiaries and Legacy. This requires a review of our cases relating to captive insurance arrangements.

1. *Precedent Relating to Parent-Subsidiary Arrangements*

In 1978, we analyzed parent-subsidiary captive arrangements for the first time. *See Carnation Co. v. Commissioner*, 71 T.C. 400 (1978), *aff'd*, 640 F.2d 1010 (9th Cir. 1981). In *Carnation*, the parties entered into two insurance contracts: an agreement between Carnation and an unrelated insurer, and a reinsurance agreement between the captive and the unrelated insurer. *Id.* at 402–404. The unrelated insurer expressed concern to Carnation about the captive's financial stability and requested a letter of credit or other guaranty. *Id.* at 404. Carnation refused to issue a letter of credit or other guaranty but did execute an agreement to provide, upon demand, $2,880,000 of additional capital to the captive. *Id.* at 402–404. We held, relying on *Le Gierse*, that the parent-subsidiary arrangement was not insurance because the three agreements (i.e., the two insurance contracts and the agreement to further capitalize the captive), when considered together, were void of insurance risk. *Id.* at 409. The Court of Appeals for the Ninth Circuit affirmed and concluded that our application of *Le Gierse* was appropriate given the interdependence of the three agreements. *See Carnation Co. v. Commissioner*, 640 F.2d at 1013. Furthermore, the Court of Appeals held that "[t]he key was that

* * * [the unrelated insurer] refused to enter into the reinsurance contract with * * * [the captive] unless Carnation" executed the capitalization agreement. *See id.*

In *Clougherty*, our next opportunity to analyze a parent-subsidiary captive arrangement, the parties entered into two insurance contracts: an agreement between Clougherty and an unrelated insurer, and a reinsurance agreement between the captive and the unrelated insurer. *Clougherty Packing Co. v. Commissioner*, 84 T.C. at 952. We concluded that "the operative facts [17] in the instant case * * * [were] indistinguishable from the facts in *Carnation*", analyzed Clougherty's balance sheet, and held that risk did not shift to the captive:

> We found in *Carnation*, as we find here, that to the extent the risk was not shifted, insurance does not exist and the payments to that extent are not insurance premiums. The measure of the risk shifted is the percentage of the premium not ceded. This is nothing more than a *recharacterization* of the payments which petitioner seeks to deduct as insurance premiums. [*Id.* at 956, 958–959.]

The Commissioner urged us to adopt his economic family theory, which posits that

> the insuring parent corporation and its domestic subsidiaries, and the wholly owned "insurance" subsidiary, though separate corporate entities, represent one economic family with the result that those who bear the ultimate economic burden of loss are the same persons who suffer the loss. To the extent that the risks of loss are not retained in their entirety by * * * or reinsured with * * * insurance companies that are unrelated to the economic family of insureds, there is no risk-shifting or risk-distributing, and no insurance, the premiums for which are deductible under section 162 of the Code. [Rev. Rul. 77–316, 1977–2 C.B. 53, 54.]

In rejecting the Commissioner's economic family theory, we emphasized that "[w]e have done nothing more in *Carnation* and here but to reclassify, as nondeductible, portions of the payments which the taxpayers deducted as insurance premiums but which were received by the taxpayer's captive insurance subsidiaries." *See Clougherty Packing Co. v. Commissioner*, 84 T.C. at 960.

---

[17] Our Opinion emphasized that the "operative" facts related to the "interdependence of all of the agreements" as confirmed by the "execution dates". *See Clougherty Packing Co. v. Commissioner*, 84 T.C. 948, 957 (1985), *aff'd*, 811 F.2d 1297 (9th Cir. 1987).

The Court of Appeals for the Ninth Circuit affirmed our decision in *Clougherty* and applied a balance sheet and net worth analysis, pursuant to which a determination of whether risk has shifted depends on whether a covered loss affects the balance sheet and net worth of the insured. *See Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1305. In defining insurance, the Court of Appeals stated that "a true insurance agreement must remove the risk of loss from the insured party." *Id.* at 1306. The Court of Appeals elaborated:

> [W]e examine the economic consequences of the captive insurance arrangement to the "insured" party to see if that party has, in fact, shifted the risk. In doing so, we look only to the insured's assets, i.e., those of Clougherty, to determine whether it has divested itself of the adverse economic consequences of a covered workers' compensation claim. Viewing only Clougherty's assets and considering only the effect of a claim on those assets, it is clear that the risk of loss has not been shifted from Clougherty. [*Id.* at 1305.]

Furthermore, the Court of Appeals explained that the balance sheet and net worth analysis does not ignore separate corporate existence:

> *Moline Properties* requires that related corporate entities be afforded separate tax status and treatment. It does not require that the Commissioner, in determining whether a corporation has shifted its risk of loss, ignore the effect of a loss upon one of the corporation's assets merely because that asset happens to be stock in a subsidiary. Because we only consider the effect of a covered claim on Clougherty's assets, our analysis in no way contravenes *Moline Properties*. [*Id.* at 1307.]

Finally, the Court of Appeals concluded that "[t]he parent of a captive insurer retains an economic stake in whether a covered loss occurs. Accordingly, an insurance agreement between parent and captive does not shift the parent's risk of loss and is not an agreement for 'insurance.'" *Id.*

2. *Precedent Relating to Brother-Sister Arrangements,*

In *Humana Inc. & Subs. v. Commissioner*, 88 T.C. at 206, we were faced with two distinct issues: the deductibility of premiums paid by a parent to a captive (parent-subsidiary arrangement) and the deductibility of premiums paid by affiliated subsidiaries to a captive (brother-sister arrangement). Humana, Inc. (Humana), operated a hospital network and, in 1976, was unable to renew its existing policies

relating to workers' compensation, malpractice, and general liability. *Id.* at 200. Humana's insurance broker could not obtain comparable coverage and recommended that Humana establish a captive insurance company. *Id.* Humana subsequently incorporated, and capitalized with $1 million, a Colorado captive. *Id.* at 201–202. The captive provided coverage relating to Humana and its subsidiaries' workers' compensation, malpractice, and general liability. *Id.* at 202–204. Humana paid the captive a monthly premium which was allocated among itself and each operating subsidiary. *Id.* at 203.

We held that the parent-subsidiary premiums were not deductible because Humana did not shift risk to the captive. *See id.* at 206–207. The brother-sister arrangement, however, presented an issue of first impression. *See id.* at 208. We rejected the Commissioner's economic family theory and held "that it is more appropriate to examine all of the facts to decide whether or to what extent there has been a shifting of the risk from one entity to the captive insurance company." *See id.* at 214. We extended our rationale from *Carnation* and *Clougherty* (i.e., recharacterizing a captive insurance arrangement as self-insurance) to brother-sister arrangements and stated that declining to do so "would exalt form over substance and permit a taxpayer to circumvent our holdings by simple corporate structural changes." *See id.* at 213. The report on which we relied, prepared by Irving Plotkin, stated: "'A firm placing its risks in a captive insurance company in which it holds a sole or predominant ownership position, is not relieving itself of financial uncertainty.'" *Id.* at 210 (fn. ref. omitted). In addition, the report stated:

> "True insurance relieves the firm's balance sheet of any potential impact of the financial consequences of the insured peril. For the price of the premiums, the insured rids itself of any economic stake in whether or not the loss occurs. * * * [However] as long as the firm deals with its captive, its balance sheet cannot be protected from the financial vicissitudes of the insured peril." [*Id.* at 211–212; alteration in original; fn. ref. omitted.]

After quoting extensively from the report and analyzing the facts, "[w]e conclude[d] that there was not the necessary shifting of risk from the operating subsidiaries of Humana Inc. to * * * [the captive] and, therefore, the amounts

charged by Humana Inc. to its subsidiaries did not constitute insurance." *See id.* at 214.

Seven Judges concurred with the opinion of the Court's parent-subsidiary holding but disagreed with the brother-sister holding. *See Humana Inc. & Subs. v. Commissioner*, 88 T.C. at 219 (Körner, J., concurring and dissenting). They found the opinion of the Court's rationale "disingenuous and entirely unconvincing" and asserted that the opinion of the Court had implicitly adopted the Commissioner's "economic family" theory. *Id.* at 223. After emphasizing that the subsidiaries had no ownership interest in the captive, paid premiums for their own insurance, and would not be affected (i.e., their balance sheets and net worth) by the payment of an insured claim, the dissent further stated:

> The theory of *Helvering v. Le Gierse*, 312 U.S. 531 (1941), may have been adequate to sustain the holdings in *Carnation* and *Clougherty*, where only a parent and its insurance subsidiary were involved. It cannot be stretched to cover the instant brother-sister situation, where there was nothing—equity ownership or otherwise—to offset the shifting of risk from the hospital subsidiaries to * * * [the captive]. If the majority is to accomplish the fell deed here, "a decent respect to the opinions of mankind requires that they should declare the causes which impel them" to such a result. [*Id.* at 224; fn. ref. omitted.]

The Court of Appeals for the Sixth Circuit affirmed our decision relating to the parent-subsidiary arrangement, but reversed our decision relating to the brother-sister arrangement. [18] *See Humana Inc. & Subs. v. Commissioner*, 881 F.2d at 251–252. The Court of Appeals for the Sixth Circuit adopted the Court of Appeals for the Ninth Circuit's balance sheet and net worth analysis and held that the subsidiaries' payments to the captive were deductible. *Id.* at 252 ("[W]e look solely to the insured's assets, * * * and consider only the effect of a claim on those assets[.]" (citing *Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1305)). In rejecting our holding relating to the brother-sister arrangement, the Court of Appeals stated that "the tax court incorrectly extended the rationale of *Carnation* and *Clougherty* in holding that the premiums paid by the subsidiaries of

---

[18] We need not defer to the Court of Appeals for the Sixth Circuit's holding because this matter is appealable to the Court of Appeals for the Fifth Circuit, which has not addressed this issue. *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

Humana Inc. to * * * [the captive], as charged to them by Humana Inc., did not constitute valid insurance agreements" and concluded that "[n]either *Carnation* nor *Clougherty* * * * provide[s] a basis for denying the deductions in the brother-sister * * * [arrangement]." *Id.* at 252–253. In response to our rationalization that "[i]f we decline to extend our holdings in *Carnation* and *Clougherty* to the brother-sister factual pattern, we would exalt form over substance and permit a taxpayer to circumvent our holdings by simple corporate structural changes", the Court of Appeals stated:

> Such an argument provides no *legal* justification for denying the deduction in the brother-sister context. The legal test is whether there has been risk distribution and risk shifting, not whether Humana Inc. is a common parent or whether its affiliates are in a brother-sister relationship to * * * [the captive]. We do not focus on the relationship of the parties per se or the particular structure of the corporation involved. We look to the assets of the insured. * * * If Humana changes its corporate structure and that change involves risk shifting and risk distribution, and that change is for a legitimate business purpose and is not a sham to avoid the payment of taxes, then it is irrelevant whether the changed corporate structure has the side effect of also permitting Humana Inc.'s affiliates to take advantage of the Internal Revenue Code § 162(a) (1954) and deduct payments to a captive insurance company under the control of the Humana parent as insurance premiums. [*Id.* at 255–256.]

The Court of Appeals held that "[t]he test to determine whether a transaction under the Internal Revenue Code § 162(a) * * * is legitimate or illegitimate is not a vague and broad 'economic reality' test. The test is whether there is risk shifting and risk distribution." *Id.* at 255. The Court of Appeals further addressed our analysis and stated:

> The tax court cannot avoid direct confrontation with the separate corporate existence doctrine of *Moline Properties* by claiming that its decision does not rest on "economic family" principles because it is merely *reclassifying* or *recharacterizing* the transaction as nondeductible additions to a reserve for losses. The tax court argues in its opinion that such "recharacterization" does not disregard the separate corporate status of the entities involved, but merely disregards the particular transactions between the entities in order to take into account *substance* over form and the "economic reality" of the transaction that no risk has shifted.
>
> The tax court misapplies this substance over form argument. The substance over form or economic reality argument is not a broad legal doctrine designed to distinguish between legitimate and illegitimate transactions and employed at the discretion of the tax court whenever it feels that a taxpayer is taking advantage of the tax laws to produce a favorable result for the taxpayer. * * * The substance over form analysis,

rather, is a distinct and limited exception to the general rule under *Moline Properties* that separate entities must be respected as such for tax purposes. The substance over form doctrine applies to disregard the separate corporate entity where "Congress has evinced an intent to the contrary" * * *

   [*Humana Inc. & Subs v. Commissioner*, 881 F.2d at 254.]

In short, we do not look to the parent to determine whether premiums paid by the subsidiaries to the captive are deductible. *Id.* at 252. The policies shifted risk because claims paid by the captive did not affect the net worth of Humana's subsidiaries. *See id.* at 252–253.

   3. *Brother-Sister Arrangements May Shift Risk.*

We find persuasive the Court of Appeals for the Sixth Circuit's critique of our analysis of the brother-sister arrangement in *Humana*. First, our extension of *Carnation* and *Clougherty* to brother-sister arrangements was improper. As the Court of Appeals correctly concluded: "*Carnation* dealt solely with the parent-subsidiary issue, not the brother-sister issue. Likewise, *Clougherty* dealt only with the parent-subsidiary issue and not the brother-sister issue. Nothing in either *Carnation* or *Clougherty* lends support for denying the deductibility of the payments in the brother-sister context." *Id.* at 253–254.

   Second, the opinion of the Court's extensive reliance on Plotkin's report to analyze the brother-sister arrangement was inappropriate. The report in *Humana* addressed parent-subsidiary, rather than brother-sister, arrangements. *See Humana Inc. & Subs. v. Commissioner*, 88 T.C. at 209; *see also supra* pp. 16–20. In the instant cases, Plotkin explicitly addressed brother-sister arrangements and stated:

   Even though the brother, the captive, and the parent are in the same economic family, to the extent that a brother has no ownership interest in the captive, the results of the parent-captive analysis do not apply. It is not the presence or absence of unrelated business, nor the number of other insureds (be they affiliates or non-affiliates), but it is the absence of ownership, the captive's capital, and the number of statistically independent risks (regardless of who owns them) that enables the captive to provide the brother with true insurance as a matter of economics and finance.

We agree. Humana's subsidiaries had no ownership interest in the captive. *See Humana Inc. & Subs. v. Commissioner*, 88

T.C. at 201–202. Thus, the parent-subsidiary analysis employed by the opinion of the Court was incorrect.

Third, we did not properly analyze the facts and circumstances. *See id.* at 214. The balance sheet and net worth analysis provides the proper analytical framework to determine risk shifting in brother-sister arrangements. *See Humana Inc. & Subs. v. Commissioner*, 881 F.2d at 252; *Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1305. Instead, we implicitly employed a substance-over-form rationale to recharacterize Humana's subsidiaries' payments as amounts set aside for self-insurance and referenced, but did not apply, the balance sheet and net worth analysis. Indeed, we did not "examine the economic consequences of the captive insurance arrangement to the 'insured' party to see if that party * * * [had], in fact, shifted the risk." *See Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1305.

4. *The Legacy Policies Shifted Risk.*

In determining whether Legacy's policies shifted risk, we narrow our scrutiny to the arrangement's economic impact on RAC's subsidiaries (i.e., the insured entities). *See Humana Inc. & Subs. v. Commissioner*, 881 F.2d at 252–253; *Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1305 ("[W]e examine the economic consequences of the captive insurance arrangement to the 'insured' party to see if that party has, in fact, shifted the risk. In doing so, we look only to the insured's assets[.]"). In direct testimony respondent's expert, however, emphasized that petitioner's "captive program * * * [did] not involve risk shifting that * * * [was] comparable to that provided by a commercial insurance program." We decline his invitation to premise our holding on a specious comparability analysis. Simply put, the risk either was, or was not, shifted.

The policies at issue shifted risk from RAC's insured subsidiaries to Legacy, which was formed for a valid business purpose; was a separate, independent, and viable entity; was financially capable of meeting its obligations; and reimbursed RAC's subsidiaries when they suffered an insurable loss. *See Sears, Roebuck & Co. v. Commissioner*, 96 T.C. 61, 100–101 (1991), *aff'd in part, rev'd in part*, 972 F.2d 858 (7th Cir. 1992); *AMERCO v. Commissioner*, 96 T.C. at 41. Moreover, a payment from Legacy to RAC's subsidiaries did not reduce

the net worth of RAC's subsidiaries because, unlike RAC, the subsidiaries did not own stock in Legacy. Indeed, on cross-examination, respondent's expert conceded that the balance sheets and net worth of RAC's subsidiaries were not affected by a covered loss and that the policies shifted risk:

> [Petitioner's counsel]: But if the loss gets paid, whose balance sheet gets affected in that case?
>
> [Respondent's expert]: What's hanging me up is that I don't know whether—I guess you're right, because * * * [RAC's subsidiary] will treat the payment from—the payment that it expects from Legacy as an asset, so the loss would hit Legacy's [balance sheet].
>
> [Petitioner's counsel]: But it wouldn't hit * * * [RAC's subsidiary's] balance sheet.
>
> [Respondent's expert]: I would think that's right. * * *
>
> [Petitioner's counsel]: Why is that not risk-shifting?
>
> [Respondent's expert]: That's an—why is that not risk-shifting?
>
> [Petitioner's counsel]: Yes. Why is that not risk-shifting? Why hasn't [RAC's subsidiary] shifted its risk to Legacy? Its insurance risk—why hasn't it shifted to Legacy in that scenario?
>
> [Respondent's expert]: I mean, I would say from an accounting perspective, it has managed to have—is it—if we're going to respect all these [corporate] forms, then it will have shifted that risk.

5. *The Parental Guaranty Did Not Vitiate Risk Shifting.*

Legacy, in March 2003, petitioned the BMA and received approval, through December 31, 2003, to treat DTAs as general business assets. On September 17, 2003, RAC issued the parental guaranty to Legacy, which petitioned, and received permission from, the BMA to treat DTAs as general business assets through December 31, 2006. Respondent contends that the parental guaranty abrogated risk shifting between Legacy and RAC's subsidiaries. We disagree. First, and most importantly, the parental guaranty did not affect the balance sheets or net worth of the subsidiaries insured by Legacy. Petitioner's expert, in response to a question the Court posed during cross-examination, convincingly countered respondent's contention:

> [The Court]: * * * [W]hat impact does the corporate structure have on the effect of the parental guarantee?
>
> [Petitioner's expert]: I think it has a great impact on it. None of the subs, as I understand it, are entering in or [are] a part of that guarantee. Only the subs are effectively insureds under the policy. They are the only ones who produce risks that could be covered. The guarantee in no way vitiates the completeness of the transfer of their uncertainty, their risk, to the insuring subsidiary.

Even if one assumes that the guarantee increases the capital that the captive could use to pay losses, none of those payments would go to the detriment of the sub as a separate legal entity.

Second, the cases upon which respondent relies are distinguishable. Respondent cites *Malone & Hyde, Inc. v. Commissioner*, 62 F.3d 835, 841 (6th Cir. 1995) (holding that a reinsurance arrangement was not bona fide because the captive was undercapitalized and the parent guaranteed the captive's obligations to an unrelated insurer), *rev'g* T.C. Memo. 1993–585; *Carnation Co. v. Commissioner*, 71 T.C. at 404, 409 (holding that a reinsurance arrangement lacked insurance risk where the captive was undercapitalized and, at the insistence of an unrelated primary insurer, the parent agreed to provide additional capital); and *Kidde Indus., Inc. v. United States*, 40 Fed. Cl. 42, 49–50 (1997) (holding that a reinsurance arrangement lacked risk shifting because the parent indemnified the captive's obligation to pay an unrelated primary insurer). Unlike the agreements in these cases, the parental guaranty did not shift the ultimate risk of loss; did not involve an undercapitalized captive; and was not issued to, or requested by, an unrelated insurer. *Cf. Malone & Hyde, Inc. v. Commissioner*, 62 F.3d at 841–843; *Carnation Co. v. Commissioner*, 71 T.C. at 404, 409; *Kidde Indus., Inc.*, 40 Fed. Cl. at 49–50.

Third, RAC guaranteed Legacy's "liabilities under the Act [i.e., the Bermuda Insurance Act and related regulations]", pursuant to which Legacy was required to maintain "certain solvency and liquidity margins". RAC did not pay any money pursuant to the parental guaranty and Legacy's "liabilities under the Act" did not include Legacy's contractual obligations to RAC's affiliates or obligations to unrelated insurers. For purposes of calculating the minimum solvency margin, Legacy treated a portion of the parental guaranty as a general business asset. *See supra* pp. 9–10. In sum, by providing the parental guaranty to the BMA, Legacy received permission to treat DTAs as general business assets and ensured its continued compliance with the BMA's solvency requirements.[19] The parental guaranty served no other purpose and

---

[19] Legacy used a portion of the parental guaranty as a general business asset. *See supra* pp. 9–10. Legacy's DTAs always exceeded the amount of
Continued

was unilaterally revoked by RAC, in 2006, when Legacy met the BMA's solvency requirements without reference to DTAs.

C. *The Legacy Policies Distributed Risk.*

Risk distribution occurs when an insurer pools a large enough collection of unrelated risks (i.e., risks that are generally unaffected by the same event or circumstance). *See Humana Inc. & Subs. v. Commissioner*, 881 F.2d at 257. "By assuming numerous relatively small, independent risks that occur randomly over time, the insurer smoothes out losses to match more closely its receipt of premiums." *Clougherty Packing Co. v. Commissioner*, 811 F.2d at 1300. This distribution also allows the insurer to more accurately predict expected future losses. In analyzing risk distribution, we look at the actions of the insurer because it is the insurer's, not the insured's, risk that is reduced by risk distribution. *See Harper Grp. v. Commissioner*, 96 T.C. at 57. A captive may achieve adequate risk distribution by insuring only subsidiaries within its affiliated group. *See Humana Inc. & Subs. v. Commissioner*, 881 F.2d at 257; Rev. Rul. 2002–90, 2002–2 C.B. 985.

Legacy insured three types of risk: workers' compensation, automobile, and general liability. During the years in issue, RAC's subsidiaries owned between 2,623 and 3,081 stores; had between 14,300 and 19,740 employees; and operated between 7,143 and 8,027 insured vehicles. RAC's subsidiaries operated stores in all 50 States, the District of Columbia, Puerto Rico, and Canada. RAC's subsidiaries had a sufficient number of statistically independent risks. Thus, by insuring RAC's subsidiaries, Legacy achieved adequate risk distribution. *See Humana Inc. & Subs. v. Commissioner*, 881 F.2d at 257.

D. *The Arrangement Constituted Insurance in the Commonly Accepted Sense.*

Legacy was adequately capitalized, regulated by the BMA, and organized and operated as an insurance company. Furthermore, Legacy issued valid and binding policies, charged and received actuarially determined premiums, and paid

─────────

the parental guaranty treated as a general business asset. *See supra* pp. 9–10.

claims. In short, the arrangement between RAC's subsidiaries and Legacy constituted insurance in the commonly accepted sense. *See Harper Grp. v. Commissioner*, 96 T.C. at 60.

### Conclusion

The payments by RAC's subsidiaries to Legacy are, pursuant to section 162, deductible as insurance expenses.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

THORNTON, VASQUEZ, WHERRY, HOLMES, BUCH, and NEGA, *JJ*., agree with this opinion of the Court.

GOEKE, *J*., did not participate in the consideration of this opinion.

———————————

BUCH, *J*., concurring: To the extent respondent is arguing that a captive insurance arrangement between brother-sister corporations cannot be insurance as a matter of law, we need not reach that issue. In Rev. Rul. 2001–31, 2001–1 C.B. 1348, 1348, the Internal Revenue Service stated that it would "no longer invoke the economic family theory with respect to captive insurance transactions." And in *Rauenhorst v. Commissioner*, 119 T.C. 157, 173 (2002), we held that we may treat as a concession a position taken by the IRS in a revenue ruling that has not been revoked. Because Rev. Rul. 2001–31 has not been revoked, we could treat the economic family argument as conceded.

At the same time the IRS abandoned the economic family theory, it made clear that it would "continue to challenge certain captive insurance transactions based on the facts and circumstances of each case." Rev. Rul. 2001–31, 2001–1 C.B. at 1348. Then, in a series of revenue rulings, the IRS shed light on the facts and circumstances it deemed relevant. *See* Rev. Rul. 2005–40, 2005–2 C.B. 4; Rev. Rul. 2002–91, 2002–2 C.B. 991; Rev. Rul. 2002–90, 2002–2 C.B. 985; Rev. Rul. 2002–89, 2002–2 C.B. 984.

The concise opinion of the Court sets forth facts and circumstances supporting its conclusion. I write separately to respond to points made in Judge Lauber's dissent.

## I. *Legacy's Policies*

Taking into account the nature of risks that Legacy insured, Legacy was sufficiently capitalized.

### A. *Long-Tail Coverage*

During each of the years in issue Legacy insured three types of risk: workers' compensation, automobile, and general liability. Policies relating to these risks are generally referred to as long-tail coverage because "claims may involve damages that are not readily observable or injuries that are difficult to ascertain." *See Acuity v. Commissioner*, T.C. Memo. 2013–209, at *8–*9. Workers' compensation insurance, which generated between 66% and 73% of Legacy's premiums[1] during the years in issue, "is generally long tail coverage because of the inherent uncertainty in determining the extent of an injured worker's need for medical treatment and loss of wages for time off work." *Id.* An insurer pays out claims relating to long-tail coverage over an extended period.

### B. *Rent-A-Center's Insurance Program*

Rent-A-Center did not obtain insurance solely from Legacy; Rent-A-Center also obtained insurance from multiple unrelated third parties. Legacy was responsible for only a portion of each claim (e.g., the first $350,000 of each workers' compensation claim during 2003). To the extent that a claim exceeded Legacy's coverage, a third-party insurer was responsible for paying the excess amount. Rent-A-Center obtained coverage from unrelated third-party insurers for claims of up to approximately $75 million. Therefore, extraordinary losses would not affect Legacy's ability to pay claims because they would be covered by unrelated third parties.

---

[1] Legacy's premiums attributable to workers' compensation liability were $28,586,597 in 2003; $35,392,000 in 2004; $36,463,579 in 2005; $39,086,374 in 2006; and $45,425,032 in 2007.

C. *Allocation Formula*

Premiums were actuarially determined. At trial respondent conceded that Aon "produced reliable and professionally produced and competent actuarial studies." Legacy relied on these studies to set premiums. Once Legacy determined the premium, Rent-A-Center allocated it to each operating subsidiary in the same manner that it allocated premiums relating to unrelated insurers. In a captive arrangement, a parent may allocate a premium among its subsidiaries. *See Humana Inc. & Subs. v. Commissioner*, 881 F.2d 247, 248 (6th Cir. 1989) ("Humana Inc. allocated and charged to the subsidiaries portions of the amounts paid representing the share each bore for the hospitals each operated."), *aff'g in part, rev'g in part and remanding* 88 T.C. 197 (1987); *Kidde Indus., Inc. v. United States*, 40 Fed. Cl. 42, 45 (1997) ("National determined the premiums that it charged Kidde based in part on underwriting data supplied by Kidde's divisions and subsidiaries * * * Kidde used these same data to allocate the total premiums among its divisions and subsidiaries.").

II. *The Parental Guaranty*

Citing a footnote in *Humana*, *see* Lauber op. p. 39, Judge Lauber's dissenting opinion asserts that the existence of a parental guaranty is enough to justify disregarding the captive insurance arrangement. That footnote, however, addresses only situations in which there is *both* inadequate capitalization and a parental guaranty, concluding: "*These weaknesses* alone provided a sufficient basis from which to find no risk shifting and to decide the cases in favor of the Commissioner." *Humana Inc. & Subs. v. Commissioner*, 881 F.2d at 254 n.2 (emphasis added). Here, the fact finder did not find inadequate capitalization. And the mere existence of a parental guaranty is not enough for us to disregard the captive insurer; we must look to the substance of that guaranty.

As the opinion of the Court finds, the parental guaranty was created to convert deferred tax assets into general business assets for regulatory purposes. *See* op. Ct. p. 22. The circumstances relating to its issuance, including that the parental guaranty was issued to Legacy and that it was lim-

ited to $25 million—or, less than 10% of the total premiums paid to Legacy—support the conclusion that it was created solely to encourage the Bermuda Monetary Authority to allow Legacy to treat DTAs as general business assets.

In contrast, the cases that have found that a parental guaranty eliminates any risk shifting involved either a blanket indemnity or a capitalization agreement that resulted in a capital infusion in excess of premiums received. And even then, the indemnity or capitalization agreement was coupled with an undercapitalized captive. Accordingly, those cases are distinguishable from the situation presented here.

*Malone & Hyde, Inc. v. Commissioner*, 62 F.3d 835 (6th Cir. 1995), *rev'g* T.C. Memo. 1993–585, involved an insurance subsidiary established to provide reinsurance for the parent and its subsidiaries. After incorporating the captive, Malone & Hyde entered into an agreement with a third-party insurer to insure both its own and its subsidiaries' risks. *Id.* at 836. The third-party insurer then reinsured the first $150,000 of coverage per claim with the captive. *Id.* Because the captive was thinly capitalized—it had no assets other than $120,000 of paid-in capital—Malone & Hyde executed "hold harmless" agreements in favor of the third-party insurer. *Id.* These agreements provided that if the captive defaulted on its obligations as reinsurer, then Malone & Hyde would completely shield the third-party insurer from liability. *Id.* In deciding whether the risk had shifted, the court held that "[w]hen the entire scheme involves either undercapitalization or indemnification of the primary insurer by the taxpayer claiming the deduction, or both, these facts alone disqualify the premium payments from being treated as ordinary and necessary business expenses to the extent such payments are ceded by the primary insurer to the captive insurance subsidiary." *Id.* at 842–843. In short, *Malone & Hyde, Inc.* had a thinly capitalized captive insurer and a blanket indemnity. Here, neither of those facts is present.

The facts in *Kidde Indus., Inc.* are quite similar to those in *Malone & Hyde, Inc.* Kidde incorporated a captive and entered into an insurance agreement with a third-party insurer who in turn entered into a reinsurance agreement with the captive. *Kidde Indus., Inc.*, 40 Fed. Cl. at 45. As in *Malone & Hyde, Inc.*, the captive was significantly under-

capitalized, and Kidde executed an indemnification agreement to provide the third-party insurer with the "level of comfort" needed before it would issue the policies. *Id.* at 48. Again, the court held that Kidde retained the risk of loss and could not deduct the premiums. *Id.*

*Carnation Co. v. Commissioner*, 71 T.C. 400 (1978), *aff'd*, 640 F.2d 1010 (9th Cir. 1981), involved slightly different facts. A captive reinsured 90% of the third-party insurer's liabilities under Carnation's policy. *Id.* at 403. As part of this arrangement, the third-party insurer ceded 90% of the premiums to the captive and the captive paid the third-party insurer a 5% commission based on the net premiums ceded. *Id.* Carnation provided $3 million of capital to the captive—an amount that was well in excess of the total annual premiums paid to the captive—because the third-party insurer had concerns about the captive's capitalization. *Id.* at 404. The Court held that the reinsurance agreement and the agreement to provide additional capital counteracted each other and voided any insurance risk. *Id.* at 409. In affirming the Tax Court, the Court of Appeals for the Ninth Circuit held that, in considering whether the risk had shifted, the key was that the third-party insurer would not have issued the policies without the capitalization agreement. *Carnation Co. v. Commissioner*, 640 F.2d at 1013.

Those cases are distinguishable because they all involved undercapitalized captives. As explained previously, the opinion of the Court found that Legacy was adequately capitalized. Further, in each of the three cases above, the parent provided either indemnification or additional capitalization in order to persuade a third-policy insurer to issue insurance policies. Here, Discover Re provided insurance before Legacy's inception and continued providing coverage after Legacy was formed. The parental guaranty was issued to Legacy for the singular purpose of allowing Legacy to treat the DTAs as general business assets. Additionally, the guaranty amounted to only $25 million. This small fraction of the $264 million in premiums for policies written by Legacy during the years in issue does not rise to the level of protection provided by the total indemnities in *Malone & Hyde, Inc.* and *Kidde Indus., Inc.*

When we consider the totality of the facts, the parental guaranty appears to have been immaterial. This conclusion

is bolstered by the facts that the parental guaranty was unilaterally withdrawn by Rent-A-Center in 2006 and that Rent-A-Center never contributed any funds to Legacy pursuant to that parental guaranty.

III. *Consolidated Groups*

Judge Lauber's dissent refers to a hodgepodge of facts about how Rent-A-Center operated its consolidated group as evidence that Legacy's status as a separate entity should be disregarded. Examples of the facts cited in that dissent are that Legacy had no employees and that payments between it and other members of the Rent-A-Center consolidated group were handled through journal entries. *See* Lauber op. p. 44.

In the real world of large corporations, these practices are commonplace. For ease of operations, including running payroll, companies create a staff leasing subsidiary and lease employees companywide. Or they hire outside consultants to handle the operations of a specialty business such as a captive insurer. Legacy, like Humana, hired an outside management company to handle its business operations. *Compare* op. Ct. note 6 (Legacy engaged Aon to provide management services) *with Humana Inc. & Subs. v. Commissioner*, 88 T.C. at 205 (Humana engaged Marsh & McLennan to provide management services). And it is unrealistic to expect members of a consolidated group to cut checks to each other. Rent-A-Center and Legacy did what is commonplace—they kept track of the flow of funds through journal entries. So long as complete and accurate records are maintained, the commingling of funds is not enough to require the disregarding of a separate business. *See, e.g.*, *Kahle v. Commissioner*, T.C. Memo. 1991–203 (finding that the taxpayer "maintained complete and accurate records" notwithstanding the commingling of business and personal funds).

Corporations filing consolidated returns are to be treated as separate entities, unless otherwise mandated. *Gottesman & Co. v. Commissioner*, 77 T.C. 1149, 1156 (1981). It may be advantageous for a corporation to operate through various subsidiaries for a multitude of reasons. These reasons may include State law implications, creditor demands, or simply convenience, but "so long as that purpose is the equivalent of business activity or is followed by the carrying on of busi-

ness by the corporation, the corporation remains a separate taxable entity." *Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 438–439 (1943). Even the consolidated return regulations make clear that an insurance company that is part of a consolidated group is treated separately. *See* sec. 1.1502–13(e)(2)(ii)(A), Income Tax Regs. ("If a member provides insurance to another member in an intercompany transaction, the transaction is taken into account by both members on a separate entity basis."). Thus, if a corporation gives due regard to the separate corporate structure, we should do the same.

## IV. *Conclusion*

The issue presented in these cases is ultimately a matter of when, not whether, Rent-A-Center is entitled to a deduction relating to workers' compensation, automobile, and general liability losses.[2] Because the IRS has conceded in its rulings that insurance premiums paid between brother-sister corporations may be insurance and the Court determined that, under the facts and circumstances of these cases as found by the Judge who presided at trial, the policies at issue are insurance, Rent-A-Center is entitled to deduct the premiums as reported on its returns. *See* op. Ct. pp. 13–25.

FOLEY, GUSTAFSON, PARIS, and KERRIGAN, *JJ.*, agree with this concurring opinion.

––––––––––––

HALPERN, *J.*, dissenting:

"'The principle of judicial parsimony' (L. Hand, J., in *Pressed Steel Car Co. v. Union Pacific Railroad Co.*, * * * [240 F. 135, 137 (S.D.N.Y. 1917)]), if nothing more, condemns a useless remedy." *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 694 (1933). While usually invoked by a court to justify a stay in discovery on other issues when one issue is dispositive of a case, 8A Charles Allen Wright,

––––––––––––

[2] If the Court had determined that the policies were not insurance, then Rent-A-Center would nevertheless have been entitled to deduct the losses as they were paid or incurred. *See* sec. 162. By forming Legacy and giving due regard to its separate structure, Rent-A-Center achieved some acceleration of deductions relating to losses that would otherwise be deductible, along with other nontax benefits. *See* op. Ct. p. 11.

Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure, sec. 2040, at 198 n.7 (3d ed. 2010), I think the principle should guide us in declining to overrule *Humana Inc. & Subs. v. Commissioner*, 88 T.C. 197 (1987), *aff'd in part, rev'd in part and remanded*, 881 F.2d 247 (6th Cir. 1989), to the extent that it holds that a captive insurance arrangement between brother-sister corporations cannot be insurance as a matter of law.

These cases are before the Court Conference for review, *see* sec. 7460(b), because we perceive that Judge Foley's report is in part overruling *Humana*, although Judge Foley does not in so many words say so. He says: "We find persuasive the Court of Appeals for the Sixth Circuit's critique of our analysis the brother-sister arrangement in *Humana*." *See* op. Ct. p. 20. The Court of Appeals said: "We reverse the tax court on * * * the brother-sister issue." *Humana Inc. & Subs. v. Commissioner*, 881 F.2d at 257. Under our Conference procedures, the Conference may not adopt a report overruling a prior report of the Court absent the affirmative vote of a majority of the Judges entitled to vote on the case. Six of the sixteen Judges entitled to vote on these cases join Judge Foley, for a total of seven clearly affirmative votes. Six Judges voted "no". Three Judges voted "concur in result", and those votes, under our procedures, are counted as affirmative votes. Whether the Court has in fact overruled a portion of *Humana* undoubtedly will be unclear to many readers of this report. The resulting confusion is unnecessary. Moreover, by putting his report overruling *Humana* before the Conference, Judge Foley has put before the Conference his subsidiary findings of fact and his ultimate finding that the brother-sister payments were correctly characterized as insurance premiums. That has attracted two side opinions, one characterizing Judge Foley's opinion as "concise" (Judge Buch), *see* concurring op. p. 26, and emphasizing evidence in the record that supports his findings and the other characterizing his ultimate findings as "conclusory" (Judge Lauber) *see* Lauber op. p. 38, and contending "the undisputed facts of the entire record warrant the opposite conclusion * * *, [that] the Rent-A-Center arrangements do not constitute 'insurance' for Federal income tax purposes." Whether I describe Judge Foley's analysis as concise or as conclusory, simply put, there is insufficient depth to it to persuade me to join his findings

(i.e., that there is risk shifting, that there is risk distribution, and, in general, that there is a bona fide insurance arrangement). I do agree with Judge Lauber that "[w]hether the facts and circumstances, evaluated in the aggregate, give rise to 'insurance' presents a question of proper characterization. It is thus a mixed question of fact and law." *See* Lauber op. p. 38. Nevertheless, had Judge Foley steered clear of *Humana*, I believe that we could have avoided Conference consideration and have left it to the appellate process (if invoked) to determine whether Judge Foley's findings are persuasive.

And I believe that Judge Foley could have steered clear of *Humana*. As both Judges Buch and Lauber point out, the Commissioner has given up on arguing that captive insurance arrangement between brother-sister corporations cannot be insurance as a matter of law. *See, e.g.*, Rev. Rul. 2001–31, 2001–C.B. 1348. Judge Foley ignores that ruling and its progeny when, pursuant to *Rauenhorst v. Commissioner*, 119 T.C. 157, 173 (2002), he could have relied on the Commissioner's concessions to steer clear of revisiting *Humana*. I agree with Judge Foley that *Humana* is not dispositive of the brother-sister insurance question in these cases, but not because I would overrule *Humana* on that issue; rather, I see no reason to address *Humana* in the light of the Commissioner's present administrative position. While I agree with Judge Foley that the facts and circumstances test provides the proper analytical framework, I otherwise dissent from his opinion.

LAUBER, *J.*, agrees with this dissent.

––––––––––––––

LAUBER, *J.*, dissenting: These cases, like *Humana Inc. & Subs. v. Commissioner*, 88 T.C. 197 (1987), *aff'd in part, rev'd in part and remanded*, 881 F.2d 247 (6th Cir. 1989), involve what I will refer to as a "classic" captive insurance company. In these cases, as in *Humana*, the captive has no outside owners and insures no outside risks. Rather, it is wholly owned by the parent of the affiliated group and it "insures" risks only of the parent and the operating subsidiaries, which stand in a brother-sister relationship to it.

In *Humana* we held that purported "insurance" premiums paid to a captive by other members of its affiliated group—whether by the parent or by the sister corporations—were not deductible for Federal income tax purposes. An essential requirement of "insurance" is the shifting of risk from insured to insurer. *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941). We held in *Humana* that "there was not the necessary shifting of risk" from the operating subsidiaries to the captive, and hence that none of the purported "premiums" constituted amounts paid for "insurance." 88 T.C. at 214. The Court of Appeals for the Sixth Circuit affirmed as to amounts paid to the captive by the parent, but reversed as to amounts paid to the captive by the sister corporations. 881 F.2d at 257.

The opinion of the Court (majority) adopts the reasoning and result of the Sixth Circuit, overrules *Humana* in part, and holds that amounts charged to the captive's sister corporations constitute deductible "insurance premiums." I dissent both from the majority's decision to overrule *Humana* and from its holding that amounts charged to the sister corporations constituted payments for "insurance" under the totality of the facts and circumstances.

I. *Background*

The captive insurance issue has a rich history to which the majority refers only episodically. It has been clear from the outset of our tax law that taxpayers (other than insurance companies) cannot deduct contributions to an insurance reserve. *Steere Tank Lines, Inc. v. United States*, 577 F.2d 279, 280 (5th Cir. 1978); *Spring Canyon Coal Co. v. Commissioner*, 43 F.2d 78, 80 (10th Cir. 1930). Thus, if a unitary operating company maintains a reserve for self-insurance, amounts it places in that reserve are not deductible as "insurance premiums."

One strategy by which taxpayers sought to avoid this non-deductibility rule was to place their self-insurance reserve into a captive insurance company. In cases involving "classic" captives—i.e., captives that have no outside owners and insure no outside risks—the courts have uniformly held that this strategy does not work. Employing various legal theories, every court to consider the question has held that

amounts paid by a parent to a classic captive do not constitute "insurance premiums."[1]

Insurance and tax advisers soon devised an alternative strategy for avoiding the bar against deduction of contributions to a self-insurance reserve—namely, adoption of or conversion to a holding company structure. In essence, an operating company would drop its self-insurance reserve into a captive; drop its operations into one or more operating subsidiaries; and have the purported "premiums" paid to the captive by the sister companies instead of by the parent. In *Humana*, we held that this strategy did not work either, reasoning that "we would exalt form over substance and permit a taxpayer to circumvent our holdings [involving parent-captive payments] by simple corporate structural changes." 88 T.C. at 213. In effect, we concluded in *Humana* that conversion to a holding-company structure—without more—should not enable a taxpayer to accomplish indirectly what it cannot accomplish directly, achieving a radically different and more beneficial tax result when there has been absolutely no change in the underlying economic reality.

While the Commissioner had success litigating the parent-captive pattern, he had surprisingly poor luck litigating the brother-sister scenario. The Tenth Circuit, like our Court, agreed that brother-sister payments to a classic captive are not deductible as "insurance premiums."[2] By contrast, the

---

[1] *See Beech Aircraft Corp. v. United States*, 797 F.2d 920 (10th Cir. 1986); *Stearns-Roger Corp. v. United States*, 774 F.2d 414, 415–416 (10th Cir. 1985); *Humana Inc. & Subs. v. Commissioner*, 88 T.C. 197, 207 (1987), *aff'd in part, rev'd in part and remanded*, 881 F.2d 247 (6th Cir. 1989); *Clougherty Packing Co. v. Commissioner*, 84 T.C. 948 (1985), *aff'd*, 811 F.2d 1297, 1307 (9th Cir. 1987); *Carnation Co. v. Commissioner*, 71 T.C. 400 (1978), *aff'd*, 640 F.2d 1010, 1013 (9th Cir. 1981). On the other hand, the courts have held that parent-captive payments may constitute "insurance premiums" where the captive has a sufficient percentage of outside owners or insures a sufficient percentage of outside risks. *See, e.g.*, *Sears, Roebuck & Co. v. Commissioner*, 96 T.C. 61 (1991) (approximately 99.75% of insured risks were outside risks), *supplemented by* 96 T.C. 671 (1991), *aff'd in part and rev'd in part*, 972 F.2d 858 (7th Cir. 1992); *Harper Grp. v. Commissioner*, 96 T.C. 45 (1991) (approximately 30% of insured risks were outside risks), *aff'd*, 979 F.2d 1341 (9th Cir. 1992); *AMERCO v. Commissioner*, 96 T.C. 18 (1991) (between 52% and 74% of insured risks were outside risks), *aff'd*, 979 F.2d 162 (9th Cir. 1992).

[2] *See Beech Aircraft Corp.*, 797 F.2d at 922; *Stearns-Roger Corp.*, 774

Continued

Sixth Circuit in *Humana* reversed our holding to this effect. And after some initial ambivalence, the Court of Federal Claims appears to have concluded that brother-sister "premium" payments are deductible. [3]

The Commissioner had even less success persuading courts to adopt the "single economic family" theory enunciated in Rev. Rul. 77–316, 1977–2 C.B. 53, upon which his litigating position was initially based. That theory was approved by the Tenth Circuit [4] and found some favor in the Ninth Circuit. [5] But it was rejected by our Court [6] as well as by the Sixth and Federal Circuits. [7]

Assessing this track record, the Commissioner made a strategic retreat. In 2001 the IRS announced that it "will no longer invoke the economic family theory with respect to captive insurance transactions." Rev. Rul. 2001–31, 2001–1 C.B. 1348, 1348. In 2002 the IRS likewise abandoned its position that there is a per se rule against the deductibility of

---

F.2d at 415–416.

[3] *Compare Mobil Oil Corp. v. United States*, 8 Cl. Ct. 555, 566 (1985) ("[B]y deducting the premiums on its tax returns, * * * [the affiliated group] achieved indirectly that which it could not do directly. It is well settled that tax consequences must turn upon the economic substance of a transaction[.]"), *with Kidde Indus., Inc. v. United States*, 40 Fed. Cl. 42 (1997) (brother-sister payments deductible for years for which parent did not provide indemnity agreement). *See generally Ocean Drilling & Exploration Co. v. United States*, 988 F.2d 1135, 1153 (Fed. Cir. 1993) (brother-sister payments deductible where captive insured significant outside risks).

[4] *See Beech Aircraft Corp.*, 797 F.2d 920; *Stearns-Roger Corp.*, 774 F.2d at 415–416. *See generally Humana*, 881 F.2d at 251 ("*Stearns-Roger*, *Mobil Oil*, and *Beech Aircraft* * * * each explicitly or implicitly adopted the economic family concept.").

[5] *See Clougherty Packing*, 811 F.2d at 1304 ("[W]e seriously doubt that the use of an economic family concept in defining insurance runs afoul of the Supreme Court's holding in *Moline Properties*."); *id.* at 1305 (finding "considerable merit in the Commissioner's [economic family] argument" but finding it unnecessary to rely on that theory); *Carnation Co.*, 640 F.2d at 1013.

[6] *See Humana*, 88 T.C. at 214 (rejecting the Commissioner's "economic family" concept); *Clougherty Packing*, 84 T.C. at 956 (same); *Carnation Co.*, 71 T.C. at 413 (same).

[7] *See Malone & Hyde, Inc. v. Commissioner*, 62 F.3d 835 (6th Cir. 1995) (rejecting "economic family" theory but ruling against deductibility of payments to captive based on facts and circumstances), *rev'g* T.C. Memo. 1993–585; *Ocean Drilling & Exploration Co.*, 988 F.2d at 1150–1151; *Humana*, 881 F.2d at 251.

brother-sister "premiums," concluding that the characterization of such payments as "insurance premiums" should be governed, not by a per se rule, but by the facts and circumstances of the particular case. Rev. Rul. 2002–90, 2002–2 C.B. 985; *accord* Rev. Rul. 2001–31, 2001–1 C.B. at 1348 ("The Service may * * * continue to challenge certain captive insurance transactions based on the facts and circumstances of each case.").

## II. *Overruling Humana*

We decided *Humana* against a legal backdrop very different from that which we confront today. The Commissioner in *Humana* urged a per se rule, predicated on his "single economic family" theory, against the deductibility of brother-sister "insurance premiums." The Commissioner has long since abandoned both that per se rule and the theory on which it was based. Given this change in the legal environment, I see no need for the Court to reconsider *Humana*, which in a practical sense may be water under the bridge.

Respondent's position in the instant cases is consistent with the ruling position the IRS has maintained for the past 12 years—namely, that characterization of intragroup payments as "insurance premiums" should be determined on the basis of the facts and circumstances of the particular case. *See* Rev. Rul. 2001–31, 2001–1 C.B. at 1348. The majority adopts this approach as the framework for its legal analysis. *See* op. Ct. pp. 13-14 ("We consider all of the facts and circumstances to determine whether an arrangement qualifies as insurance."). The Court need not overrule *Humana* to decide (erroneously in my view) that respondent should lose under the facts-and-circumstances approach that respondent is now advancing. In *Humana*, "we emphasize[d] that our holding * * * [was] based upon the factual pattern presented in * * * [that] case," noting that in other cases "factual patterns may differ." 88 T.C. at 208. That being so, the Court today could rule for petitioners on the basis of what the majority believes to be the controlling "facts and circumstances," distinguishing *Humana* rather than overruling it. Principles of judicial restraint counsel that courts should decide cases on the narrowest possible ground.

III. *The "Facts and Circumstances" Approach*

Although I do not believe it necessary or proper to overrule *Humana*, the continuing vitality of that precedent does not control the outcome. These cases can and should be decided in respondent's favor under the "facts and circumstances" approach that he is currently advancing. In Rev. Rul. 2002–90, 2002–2 C.B. at 985, the IRS concluded that brother-sister payments were correctly characterized as "insurance premiums" where the assumed facts included the following (P = parent and S = captive):

> P provides S adequate capital * * *. S charges the 12 [operating] subsidiaries arms-length premiums, which are established according to customary industry rating formulas. * * * There are no parental (or other related party) guarantees of any kind made in favor of S. * * * In all respects, the parties conduct themselves in a manner consistent with the standards applicable to an insurance arrangement between unrelated parties.

The facts of the instant cases, concerning both "risk shifting" and conformity to arm's-length insurance standards, differ substantially from the facts assumed in Rev. Rul. 2002–90, *supra*. The instant facts also differ substantially from the facts determined in judicial precedents that have characterized intragroup payments as "insurance premiums." Whether the facts and circumstances, evaluated in the aggregate, give rise to "insurance" presents a question of proper characterization. It is thus a mixed question of fact and law.

The majority makes certain findings of basic fact, which I accept for purposes of this dissenting opinion. In many instances, however, the majority makes no findings of basic fact to support its conclusory findings of ultimate fact. In other instances, the majority does not mention facts that tend to undermine its ultimate conclusions. In my view, the undisputed facts of the entire record warrant the opposite conclusion from that reached by the majority and justify a ruling that the Rent-A-Center arrangements do not constitute "insurance" for Federal income tax purposes.

A. *Risk Shifting*

1. *Parental Guaranty*

Rent-A-Center, the parent, issued two types of guaranties to Legacy, its captive. First, it guaranteed the multi-million-

dollar "deferred tax asset" (DTA) on Legacy's balance sheet, which arose from timing differences between the captive's fiscal year and the parent's calendar year. Normally, a DTA cannot be counted as an "asset" for purposes of the (rather modest) minimum solvency requirements of Bermuda insurance law. The parent's guaranty was essential in order for Legacy to secure an exception from this rule.

Second, the parent subsequently issued an all-purpose guaranty by which it agreed to hold Legacy harmless for its liabilities under the Bermuda Insurance Act up to $25 million. These liabilities necessarily included Legacy's liabilities to pay loss claims of its sister corporations. This all-purpose $25 million guaranty was eliminated at yearend 2006, but it was in existence for the first three tax years at issue.

When approving the brother-sister premiums in Rev. Rul. 2002–90, 2002–2 C.B. at 985, the IRS explicitly excluded from the hypothesized facts the existence of any parental or related-party guaranty executed in favor of the captive. Numerous courts have likewise ruled that the existence of a parental guaranty, indemnification agreement, or similar instrument may negate the existence of "insurance" purportedly supplied by a captive. *See, e.g.*, *Malone & Hyde, Inc. v. Commissioner*, 62 F.3d 835, 842–843 (6th Cir. 1995) (finding no "insurance" where parent guaranteed captive's liabilities), *rev'g* T.C. Memo. 1993–585; *Humana*, 881 F.2d at 254 n.2 (presence of parental indemnification or recapitalization agreement may provide a sufficient basis on which to find no "risk shifting"); *Carnation Co. v. Commissioner*, 71 T.C. 400, 402, 409 (1978) (finding no "insurance" where parent agreed to supply captive with additional capital), *aff'd*, 640 F.2d 1010 (9th Cir. 1981); *Kidde Indus., Inc. v. United States*, 40 Fed. Cl. 42, 50 (1997) (finding no "insurance" where parent issued indemnification letter).

By guaranteeing Legacy's liabilities, Rent-A-Center agreed to step into Legacy's shoes to pay its affiliates' loss claims. In effect, the parent thus became an "insurer" of its subsidiaries' risks. The majority cites no authority, and I know of none, for the proposition that a holding company can "insure" the risks of its wholly owned subsidiaries. The presence of this parental guaranty argues strongly against the existence of "risk shifting" here.

The majority asserts that Rent-A-Center's parental guaranty "did not vitiate risk shifting" and offers three rationales for this conclusion. *See* op. Ct. pp. 22–24. None of these rationales is convincing. The majority notes that the parent "did not pay any money pursuant to the parental guaranty" and suggests that the guaranty was really designed only to make sure that Legacy's DTAs were counted in calculating its Bermuda minimum solvency margin. *See id.* p. 23. The fact that the parent was never required *to pay* on the guaranty is irrelevant; it is *the existence* of a parental guaranty that matters in determining whether a captive is truly providing "insurance." And whatever may have prompted the issuance of the guaranty, the fact is that it literally covers *all* of Legacy's liabilities up to $25 million. The DTAs never got above $9 million during 2003–06. *See id.* p. 10. Legacy's "liabilities" obviously included Legacy's liability to pay the insurance claims of its sister companies.

The majority contends that the judicial precedents cited above "are distinguishable" because the guaranty issued by Rent-A-Center "did not shift the ultimate risk of loss; did not involve an undercapitalized captive; and was not issued to, or requested by, an unrelated insurer." *See id.* p. 23. The majority's first asserted distinction begs the question because it assumes that risk has been shifted to Legacy, which is the proposition that must be proved. The majority's second asserted distinction is a play on words. While Legacy for most of the period at issue was not "undercapitalized" from the standpoint of Bermuda's (modest) minimum solvency rules, it was very poorly capitalized in comparison with real insurance companies. *See infra* pp. 41–43. Moreover, the Court of Appeals for the Sixth Circuit in *Humana* indicated that a parental guaranty alone, without regard to the captive's capitalization, can "provide[] a sufficient basis from which to find no risk shifting." 881 F.2d at 245 n.2. The majority's third asserted distinction is a distinction without a difference. While Rent-A-Center's guaranty was not requested by "an unrelated insurer," it was demanded by Legacy's nominal insurance regulator as a condition of meeting Bermuda's minimum solvency requirements.

As the "most important[]" ground for deeming the guaranty irrelevant, the majority asserts that the parental guaranty "did not affect the balance sheets or net worth of the

subsidiaries insured by Legacy." *See* op. Ct. p. 22. The majority here reprises its argument that the "net worth and balance sheet analysis" must be conducted at the level of the operating subsidiaries. *See id.* pp. 15-16, 21. Whatever the merit of that argument generally, as applied to the guaranty it clearly proves too much. A parental guaranty of a captive's liabilities *will never* affect the balance sheet or net worth of the sister company that is allegedly "insured." But the Sixth Circuit, the Federal Circuit, and this Court have all held that the existence of a parental guaranty may negate the existence of "insurance" within an affiliated group.

### 2. *Inadequate Capitalization*

When blessing the brother-sister premium payments in Rev. Rul. 2002–90, *supra*, the Commissioner hypothesized that the parent had supplied the captive with "adequate capital." Numerous judicial opinions have likewise held that risk cannot be "shifted" to a captive unless the captive is sufficiently capitalized to absorb the risk. *See, e.g.*, *Beech Aircraft*, 797 F.2d at 922 n.1 (no "insurance" where captive was undercapitalized); *Carnation Co.*, 71 T.C. at 409 (same).

The majority bases its conclusion that Legacy was "adequately capitalized" on the fact that Legacy "met Bermuda's minimum statutory requirements" once the parental guaranty of the DTA is counted. *See* op. Ct. p. 13. The fact that a captive meets the minimum capital requirements of an offshore financial center is not dispositive as to whether the arrangements constitute "insurance" for Federal income tax purposes. Indeed, the Sixth Circuit in *Malone & Hyde* held that intragroup payments were not "insurance premiums" even though the captive met "the extremely thin minimum capitalization required by Bermuda law." 62 F.3d at 841.

In fact, Legacy's capital structure was extremely questionable during 2003–06. The only way that Legacy was able to meet Bermuda's extremely thin minimum capitalization requirement was by counting as general business assets its DTAs, and those DTAs could be counted only after Rent-A-Center issued its parental guaranty. The DTAs were essentially a bookkeeping entry. Without treating that bookkeeping entry as an "asset," Legacy would have been undercapitalized even by Bermuda's lax standards.

The extent of Legacy's undercapitalization is evidenced by its premium-to-surplus ratio, which was wildly out of line with the ratios of real insurance companies. The premium-to-surplus ratio provides a good benchmark of an insurer's ability to absorb risk by drawing on its surplus to pay incurred losses. In this ratio, "premiums written" serves as a proxy for the losses to which the insurer is exposed. Expert testimony in these cases indicated that U.S. property/casualty insurance companies, on average, have something like a 1:1 premium-to-surplus ratio. In other words, their surplus roughly equals the annual premiums for policies they write. By contrast, Legacy's premium-to-surplus ratio—ignoring the parental guaranty of its DTA—was 48:1 in 2003, 19:1 in 2004, 11:1 in 2005, and in excess of 5:1 in 2006 and 2007. In other words, Legacy's surplus covered only 2% of premiums for policies written in 2003 and only 5% of premiums for policies written in 2004, whereas commercial insurance companies have surplus coverage in the range of 100%. Even if we allow the parental guaranty to count toward Legacy's surplus, its premium-to-surplus ratio was never better than 5:1.

Legacy's assets were undiversified and modest. It had a money market fund into which it placed the supposed "premiums" received from its parent. This fund was in no sense "surplus"; it was a mere holding tank for cash used to pay "claims." Apart from this money market fund, Legacy appears to have had no assets during the tax years at issue except the following: (a) the guaranties issued by its parent; (b) the DTA reflected on its balance sheet; and (c) Rent-A-Center treasury stock that Legacy purchased from its parent. For Federal tax purposes, the parental guaranties cannot count as "assets" in determining whether Legacy was adequately capitalized. They point in the precisely opposite direction.

The DTA and treasury stock have in common several features that make them poor forms of insurance capital. First, neither yields income. The DTA was an accounting entry that by definition cannot yield income, and the Rent-A-Center treasury stock paid no dividends. No true insurance company would invest 100% of its "reserves" in non-income-producing assets. With no potential to earn income, the "reserves" could not grow to afford a cushion against risk.

Moreover, neither the DTA nor the treasury stock was readily convertible into cash. The DTA had no cash value. The treasury stock by its terms could not be sold or alienated, although the parent agreed to buy it back at its issue price. In effect, Legacy relied on the availability of cash from its parent, via repurchase of treasury shares, to pay claims in the event of voluminous losses. [8]

Finally, Legacy's assets were, to a large degree, negatively correlated with its insurance risks. During 2004–06, Legacy purchased $108 million of Rent-A-Center treasury stock, while "insuring" solely Rent-A-Center risks. Thus, if outsized losses occurred, those losses would simultaneously increase Legacy's liabilities and reduce the value of the Rent-A-Center stock that was Legacy's principal asset. No true insurance company invests its reserves in assets that are both undiversified and negatively correlated to the risks that it is insuring.

In sum, when one combines the existence of the parental guaranty, Legacy's extremely weak premium-to-surplus ratio, the speculative nature and poor quality of the assets in Legacy's "insurance reserves," and the fact that Legacy without the parental guaranty would not even have met "the extremely thin minimum capitalization required by Bermuda law," *Malone & Hyde*, 62 F.3d at 841, the absence of "risk shifting" seems clear. Under the totality of the facts and circumstances, I conclude that there has been no transfer of risk to the captive and hence that the Rent-A-Center arrangements do not constitute "insurance" for Federal income tax purposes.

### B. *Conformity to Insurance Industry Standards*

When blessing the brother-sister premiums in Rev. Rul. 2002–90, *supra*, the IRS hypothesized that "the parties [had] conduct[ed] themselves in a manner consistent with the standards applicable to an insurance arrangement between unrelated parties." Our Court has similarly ruled that transactions in a captive-insurance context must comport with

---

[8] Because Legacy "insured" losses only below a defined threshold, there was a cap on the size of any individual loss that it might have to pay. *See* op. Ct. p. 5. However, the number of individual loss events within that tranche could exceed expectations.

"commonly accepted notions of insurance." *Harper Grp. v. Commissioner*, 96 T.C. 45, 58 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992). Because risk shifting is essential to "insurance," *Helvering v. Le Gierse*, 312 U.S. at 539, the absence of risk shifting alone would dictate that the Rent-A-Center payments are not deductible as "insurance premiums." However, there are a number of respects in which Rent-A-Center, its captive, and the allegedly "insured" subsidiaries did not conduct themselves in a manner consistent with accepted insurance industry norms. These facts provide additional support for concluding that these arrangements did not constitute "insurance."

Several facts discussed above in connection with "risk shifting" show that the Rent-A-Center arrangements do not comport with normal insurance industry practice. These include the facts that Legacy was poorly capitalized; that its premium-to-surplus ratio was way out of line with the ratios of true insurance companies; and that is "reserves" consisted of assets that were non-income-producing, illiquid, undiversified, and negatively correlated to the risks it was supposedly "insuring." No true insurance company would act this way.

It appears that Legacy had no actual employees during the tax years at issue. It had no outside directors, and it had no officers apart from people who were also officers of Rent-A-Center, its parent. Legacy's "operations" appear to have been conducted by David Glasgow, an employee of Rent-A-Center, its parent. "Premium payments" and "loss reimbursements" were effected through bookkeeping entries made by accountants at Rent-A-Center's corporate headquarters. Legacy was in practical effect an incorporated pocketbook that served as a repository for what had been, until 2003, Rent-A-Center's self-insurance reserve.

Legacy issued its first two "insurance policies" before receiving a certificate of registration from Bermuda insurance authorities. According to those authorities, Legacy was therefore in violation of Bermuda law and "engaged in the insurance business without a license." (Bermuda evidently agreed to let petitioners fix this problem retroactively.)

For the first three months of its existence, Legacy was in violation of Bermuda's minimum capital rules because the DTA was not cognizable in determining capital adequacy.

Only upon the issuance of the parental guaranty in March 2003, and the acceptance of this guaranty by Bermuda authorities, was Legacy able to pass Bermuda's capital adequacy test.

There was no actuarial determination of the premium payable to Legacy by each operating subsidiary based on the specific subsidiary's risk profile. Rather, an outside insurance adviser estimated the future loss exposure of the affiliated group, and Rent-A-Center, the parent, determined an aggregate "premium" using that estimate. The parent paid this "premium" annually to Legacy. The parent's accounting department subsequently charged portions of this "premium" to each subsidiary, in the same manner as self-insurance costs had been charged to those subsidiaries before Legacy was created. In other words, in contrast to the facts assumed in Rev. Rul. 2002–90, *supra*, there was in these cases no determination of "arms-length premiums * * * established according to customary industry rating formulas." To the contrary, the entire arrangement was orchestrated exactly as it had been orchestrated before 2003, when the Rent-A-Center group maintained a self-insurance reserve for the tranche of risks purportedly "insured" by Legacy.

From Legacy's inception in December 2002 through May 2004, Legacy did not actually pay "loss claims" submitted by the supposed "insureds." Rather, the parent's accounting department netted "loss reimbursements" due to the subsidiaries from Legacy against "premium payments" due to Legacy from the parent. Beginning in July 2004, the parent withdrew a fixed, preset amount of cash via weekly bank wire from Legacy's money market account. These weekly withdrawals depleted Legacy's money market account to near zero just before the next annual "premium" was due. This modus operandi shows that Rent-A-Center regarded Legacy not as an insurer operating at arm's length but as a bank account into which it made deposits and from which it made withdrawals.

These facts, considered in their totality, lead me to disagree with the majority's conclusory assertions that "Legacy entered into bona fide arm's length contracts with * * * [Rent-A-Center]"; that Legacy "charged actuarially determined premiums"; that Legacy "paid claims from its separately maintained account"; and that Legacy "was adequately

capitalized." *See* op. Ct. p. 13. In my view, the totality of the facts and circumstances could warrant the conclusion that Legacy was a sham. At the very least, the totality of the facts and circumstances makes clear that the arrangements here did not comport with "commonly accepted notions of insurance," *Harper Grp.*, 96 T.C. at 58, and that the Rent-A-Center group of companies did not "conduct themselves in a manner consistent with the standards applicable to an insurance arrangement between unrelated parties," Rev. Rul. 2002–90, 2001–2 C.B. at 985. The departures from accepted insurance industry practice, combined with the absence of risk shifting to the captive from the alleged "insureds," confirms that these arrangements did not constitute "insurance" for Federal income tax purposes.

COLVIN, GALE, KROUPA, and MORRISON, *JJ.*, agree with this dissent.